# Illinois Official Reports

## Appellate Court

---

**People v. Foster, 2020 IL App (2d) 170683**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ORANE FOSTER, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-17-0683 |
| Filed<br>Rehearing denied | February 25, 2020<br>March 26, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 15-CF-1333; the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Darren E. Miller, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Presiding Justice Birkett and Justice Burke concurred in the judgment and opinion. |

<center>**OPINION**</center>

¶ 1    Following a jury trial in the circuit court of Kane County, defendant, Orane Foster, was found guilty of four counts of predatory criminal sexual assault of a child under 13 years of age (720 ILCS 5/11-1.40(a)(1) (West 2014)) and two counts of aggravated criminal sexual abuse of a victim under 13 years of age (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)).[1] The jury found defendant not guilty of a single count of predatory criminal sexual assault that alleged anal penetration. The court sentenced defendant to six years' imprisonment on each of the four counts of predatory criminal sexual assault, to run consecutively, and three years' imprisonment on both counts of aggravated criminal sexual abuse, to run concurrently with each other but consecutively to the sentences imposed for predatory criminal sexual assault, for a total of 27 years' imprisonment. Defendant raises questions regarding (1) the sufficiency of the evidence, (2) one-act, one-crime principles, and (3) *voir dire* violations. For the reasons that follow, we reverse and remand for further proceedings.

¶ 2    <center>I. BACKGROUND</center>

¶ 3    On August 14, 2015, six-year-old S.L., her father, Sergio L., and her father's friend and former paramour, Jazmin L.T., were vacationing at Disney World in Florida. Jazmin testified at the trial that, while she and S.L. were waiting in line for a ride, S.L. injured her hand on a railing. Jazmin said that when she asked to see S.L.'s hand, S.L. instead commented that her hand hurt less than her leg. S.L. pointed to a linear scratch that ran perpendicularly across her thigh for approximately 10 centimeters (3.9 inches), about midway between her knee and the top of her leg. Jazmin repeatedly asked S.L. what had happened, and S.L. answered in what Jazmin described as a nervous demeanor that she did not want to get her mommy in trouble. Jazmin continued her questioning. S.L. ultimately told her, while pointing to her vagina, that a man whom she identified as either "Orane" or "Dorane" "hurts" her and "puts" his fingers in her "private part." Jazmin testified that she decided to quit asking questions because S.L. was visibly uncomfortable and they were in an especially crowded public area.

¶ 4    Later, after returning to their hotel room, Jazmin put S.L. to bed and told Sergio about part of her conversation with S.L. The next morning, after Jazmin had left to go grocery shopping, Sergio questioned S.L. about what she had discussed with Jazmin. S.L. told Sergio about the man who would hurt her and put his fingers in her vagina. Sometime during the morning, Sergio spoke with his sister, Patricia L. (Patty), about what S.L. had told him. Sergio and Jazmin decided to finish out the two remaining days of their trip to Disney World and to contact the authorities upon their return to Illinois.

¶ 5    On August 18, 2015, when Sergio, Jazmin, and S.L. were back in Illinois, Jazmin drove S.L. to meet with Sergio's mother, Celia S., and Patty. Jazmin testified that during the drive S.L. additionally told her that the man would put his "private part" in what S.L. called her "booty."

---

[1]Defendant was indicted on five counts of predatory criminal sexual assault and two counts of aggravated criminal sexual abuse. Counts I and II alleged that defendant placed his finger in the sex organ of S.L. Counts III and IV alleged that defendant placed an object in the sex organ of S.L. Count V alleged that defendant penetrated S.L.'s anus. Counts VI and VII alleged that defendant touched the sex organ of S.L. for the purpose of sexual gratification or arousal.

<center>- 2 -</center>

¶ 6    Patty testified that, after they arrived at Celia's house, she took S.L. inside the home to talk with her privately while Jazmin and Celia remained outside. S.L. told Patty that her "uncle," whom she later identified as "Orane" or "Oryan," would hurt her at night when her mother went to the grocery store. Specifically, S.L said that he would put his fingers in her private part. She also said that he would "try to put his thing" inside of her and that he tried to put it in her "butt." S.L. described waking up to her uncle touching her and said that he would cover her mouth when she began to cry. He told S.L. that he was not doing anything and that she should go back to sleep, and then he would run toward the kitchen. She described another incident where the man choked her in a bathroom.

¶ 7    Following this 20-minute conversation, Patty went outside and told Celia that they needed to call the Department of Children and Family Services (DCFS), which Patty did. While they waited for DCFS to call back, Celia went inside to look after S.L. Celia testified that she was giving S.L. milk and cookies when S.L. asked her if Celia would go to S.L.'s house, sit on her bed, and see if the man would do to Celia what he did to S.L. When they had not heard back from DCFS within an hour, Patty called the Aurora police. The police responded and initiated an investigation.

¶ 8    Pam Ely testified that in August 2015 she had been employed with the Kane County Child Advocacy Center (CAC) and that she had conducted child abuse investigations in that role for 21 years. Prior to that, she conducted child abuse investigations for DCFS for eight years. She is a licensed clinical professional counselor. Ely described the CAC as a "one-stop shop for all matters involving alleged child sexual abuse." The CAC has a multidisciplinary team that consists of CAC investigators, DCFS investigators, police officers, victim advocates, medical personnel, and counselors. Ely testified that her specific training and experience include "forensic interviews" of children, which involves building a rapport and fact-finding without asking leading questions. Ely testified that all reported cases in Kane County of sexual abuse involving children age 13 or younger are assigned to the specialized team at the CAC.

¶ 9    On August 19, 2015, Ely conducted a forensic interview with S.L. at the CAC. The interview was video recorded and transcribed. Copies of the transcript were provided to each juror immediately before the State played the video at trial. During the interview, S.L. asked Ely if she could help get her "uncle," whom she named as Orane Foster, out of her house. S.L said that her uncle was doing bad stuff to her in the night when her mother went grocery shopping. S.L. said that he comes to her bed when she is sleeping and hurts her by poking her with his finger and a pen where she goes potty, which she identified as her vagina. S.L said that he told her in a scary way that she was not to tell anybody about what happened. S.L. said that it happened more than once with his finger and twice with the pen.

¶ 10   Dr. Raymond Davis, a practicing pediatrician and teaching faculty member at the University of Illinois College of Medicine in Rockford, testified as a board-certified expert in the field of child abuse pediatrics. He stated that he performs about 75 child sexual assault examinations each year and that he has testified in many counties in Illinois on the subjects of child abuse and neglect, sexual assault, and sexual abuse diagnosis.

¶ 11   On August 19, 2015, Davis performed a sexual assault examination of S.L. He testified that S.L. told him that "Orane" poked her a lot with his finger and a pen in the place from where she pees. She also told him that Orane would touch or poke her in the "butt hole." She said that these things would happen at night when her mother was not there and that she would wake up to him touching her. When she woke, he would tell her that he was not doing anything.

She also described an incident that happened during the day. She said that when she went into the bathroom to go potty, Orane followed her inside, choked her, and told her that she had better not tell anybody or he would choke her and hurt her every day. S.L. also told Davis about another incident, where Orane attempted to "tie her arms with a belt, wrap her up with his belt."

¶ 12    Davis testified that his physical examination of S.L.'s genital and rectal areas returned "normal" results but that he could not rule out sexual abuse. He explained that, even when tears or injuries result from a sexual assault, the genital and rectal regions generally heal completely within weeks to an extent that even an expert is unable to recognize any abnormalities. As a result, more than 95% of sexual assault evaluations end with normal results.

¶ 13    S.L. testified at the trial. She was then eight years old and repeatedly said that she could not remember details of what she told Ely and others two years earlier. For example, she could not remember defendant's last name, whether he worked when he lived with her, or any of the relevant details from her interview with Ely. She said that she purposely tried to forget what had happened to her: "I forgot what happened because, um, I just didn't want to remember about it, because at the time that I had to go to my cousin's house, she took me just somewhere else to forget about it; so I forgot all about it and then I forgot everything." She testified that "something" happened to her, on her body, while her mother was grocery shopping and that it was done by a male person who lived with her and who slept on a couch in the living room. S.L. was not asked to identify defendant in court. She confirmed that she had "problems" with defendant, but she did not accuse him of abuse: "Um, I don't know what kind of problems, like. It's just—I don't know what kind of problems."

¶ 14    Sashonie M. (Sasha), S.L.'s mother, testified that defendant lived with her and S.L. for approximately 63 days during the summer of 2015. She stated that defendant was her best friend's cousin and that she permitted him to sleep on her couch after his father asked him to leave his family home. Sasha said that defendant worked at a temporary job and was planning to go to school in Georgia in the fall. She never left S.L. alone with defendant for long periods of time. She did, however, recall going to a nearby Dollar Store once or twice after S.L. had already gone to bed and while defendant was in the home. Sasha testified that she remembered a time when she told S.L. that she was going somewhere, and S.L. replied that she was not going to stay with defendant. Sasha said that S.L. seemed scared and that this was the first time she had seen that demeanor in S.L.

¶ 15    Defendant testified that he lived with Sasha and S.L. during the summer of 2015. He said that he moved in with Sasha after he left his father's home due to a falling out over money. He agreed to pay Sasha $400 dollars per month in rent. Defendant testified that he got along well with S.L. and that he taught her about the Bible and mathematics. Defendant stated that he spent time at Sasha's home only to take naps after work. He said that he would get off work between 2:30 p.m. and 4:30 p.m., take a nap, go to the gym, and go to his uncle's plumbing shop to help him. During a two-week period in July 2015, he spent afternoons and evenings at another uncle's house, practicing a dance for his niece's upcoming debutante ball. He testified that he spent all of his weekends with two cousins at his aunt's house

¶ 16    Defendant denied ever having put or attempting to put his finger, penis, pen, or other object in S.L.'s vagina or anus. He said that he would never do anything like that: "Because that's just not my nature. My family raise [*sic*] me to be a better person. We came from Jamaica, and we have an American dream that we're trying to accomplish." He further testified that he would

never commit a criminal act and said, "my family set a high standard for us, and I can't get a chance to ruin it; give my family a bad name."

¶ 17 Two of defendant's uncles and two of his cousins testified during his case-in-chief. They corroborated defendant's testimony in that they all testified that they would see him regularly after work during the afternoons and evenings or on the weekends.

¶ 18 During closing argument, the State urged the jury to convict based on the many statements S.L. gave to various witnesses. The State urged the jury to overlook the fact that, in the courtroom in front of defendant and many strangers, S.L. could not testify to the details of her abuse. Defendant responded that most of the evidence of his guilt came from the biased hearsay testimony of S.L.'s family members. He argued that S.L.'s statements were inconsistent and that at the trial she did not accuse him of abuse. The jury found defendant guilty of six of the seven counts in the indictment. Defendant timely appealed.

¶ 19                                II. ANALYSIS

¶ 20 Defendant challenges (1) the sufficiency of the evidence, (2) purported one-act, one-crime violations, and (3) errors by the trial court during *voir dire*. He argues that the State failed to prove him guilty beyond a reasonable doubt of three of the four counts of predatory criminal sexual assault. Alternatively, defendant argues based on a one-act, one-crime theory that the State failed to prove more than one act of penetration with his finger and more than one act of penetration with an object. Lastly, defendant contends that purported errors by the court during *voir dire* denied him a fair trial.

¶ 21 The State counters that (1) it presented sufficient evidence to prove defendant guilty on all four counts of predatory criminal sexual assault, (2) there were no one-act, one-crime violations, and (3) defendant's unpreserved *voir dire* issues do not constitute plain error.

¶ 22                        A. Sufficiency of the Evidence

¶ 23 Defendant contends that the State failed to prove his guilt on three of the four counts of predatory criminal sexual assault. He acknowledges that there was sufficient proof on one count, alleging penetration of S.L.'s vagina with his finger, but he argues that there was insufficient evidence of a second act of penetration with his finger and insufficient evidence of either of the counts alleging penetration of S.L.'s vagina with an object. Defendant essentially concedes that there was proof beyond a reasonable doubt that he sexually assaulted S.L., but he challenges whether the State proved that he assaulted her more than once with his finger or at all with an object.

¶ 24 When a defendant challenges the sufficiency of the evidence against him, it is not the function of this court to retry the defendant but, rather, to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 25 Citing *People v. Smith*, 191 Ill. 2d 408, 411 (2000), defendant asserts that we should review this issue by the nondeferential *de novo* standard. He contends that, like in *Smith*, the facts here are not in dispute and that our review involves only a question of law. Defendant's assertion that the facts in this case are not in dispute is frivolous and without merit. For example,

defendant argues that he committed only one act of penetration, but there is ample evidence in the record of multiple acts of penetration. Accordingly, *Smith* is distinguishable, and we review defendant's sufficiency of the evidence claim under the familiar standard of whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261.

¶ 26                            1. *Hearsay Testimony*

¶ 27        Throughout his opening and reply briefs, defendant asserts that most of the testimony against him was uncorroborated "hearsay" statements and that the State presented "no evidence of an actual intrusion." Defendant implies that the hearsay testimony does not support the convictions, but he does not claim that it was improperly admitted at trial.

¶ 28        Section 115-10 of the Code of Criminal Procedure of 1963 allows certain hearsay statements to be admitted as evidence at a trial. 725 ILCS 5/115-10 (West 2016). In a prosecution for a sexual act perpetrated against a person under the age of 13, testimony of the victim's out-of-court statement describing any act that is an element of the offense charged shall be admissible if the court finds that there are sufficient safeguards of reliability and the child testifies at the proceeding. 725 ILCS 5/115-10(a), (b) (West 2016). The purpose of this hearsay exception is to alleviate concerns that at trial very young child witnesses often lack the cognitive skills to effectively communicate instances of abuse or might be psychologically impeded from doing so. *People v. Bowen*, 183 Ill. 2d 103, 115 (1998).

¶ 29        Before the trial, the court held a section 115-10 hearing and found that there were sufficient safeguards of reliability and that S.L. had no motive to fabricate her statements to the witnesses. Over defendant's objection, the court deemed admissible the proposed section 115-10 testimony, provided that S.L. testified. For every witness who testified pursuant to section 115-10, the court read the following instruction to the jury:

> "You have before you evidence that [S.L.] made statements concerning the offenses charged in this case. It is for you to determine what weight should be given to the statements. In making that determination, you should consider the age and maturity of [S.L.], the nature of the statements, and the circumstances under which the statements were made."

The court repeated this admonishment while instructing the jury before the deliberations, and it also included the following instruction:

> "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and his opportunity to observe, his age, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all of the evidence in the case."

¶ 30        Although defendant complains of the hearsay nature of the testimony provided by the section 115-10 witnesses, he does not challenge the admissibility of that evidence. The record indicates that the court conducted a proper hearing on the admissibility of the testimony and gave the jury the required admonishments. Once the evidence was admitted, it was the function of the jury to evaluate the credibility of the witnesses and to weigh the evidence accordingly. *People v. Dismuke*, 2017 IL App (2d) 141203, ¶ 42 ("[I]t is the responsibility of the trier of

fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the evidence."). Therefore, despite defendant's contention that there was no evidence of sexual penetration on three of the four counts of predatory sexual assault, the testimonial evidence given by every section 115-10 witness was properly admitted at trial.

¶ 31                    2. *Counts I and II—Sexual Penetration With a Finger*

¶ 32        Defendant argues that the State failed to prove that there was more than one intrusion of his finger into S.L.'s vagina. The gist of defendant's argument is that the testimony of the various section 115-10 witnesses proved only one act of penetration with his finger.

¶ 33        "Sexual penetration"—here, in the context of finger to vagina—means any *intrusion*, however slight, of any body part of one person into the sex organ of another person. 720 ILCS 5/11-0.1 (West 2014). Multiple witnesses testified as to what S.L. had disclosed about defendant's actions toward S.L. Jazmin testified that S.L. told her that defendant "hurts" her and that he "did things to her." When Jazmin pressed for more information, S.L. told her that defendant "puts [his] fingers in her vagina." Patty testified that S.L. told her that defendant would "put his fingers in her private part" and that he would "try to put his thing inside her."

¶ 34        During the recorded forensic interview with Ely, S.L. said that defendant "does bad stuff to me" and "hurts me." S.L. told Ely that defendant would use his finger to hurt her where she goes potty, like he was poking something. S.L. said that his finger "sometimes" went inside her clothes and touched her skin. When Ely asked her to clarify if this happened one time or more than one time, S.L. answered: "More than one time."

¶ 35        Davis testified that, during his sexual assault examination of S.L., she told him that defendant poked her a lot in the place from where she pees, with his finger and a pen. S.L. also told Davis that defendant poked or touched her in her "butt hole."

¶ 36        Defendant argues that S.L.'s statements to Ely and Davis about the touching or poking do not prove an actual intrusion. Further, defendant argues that S.L. did not tell Jazmin or Patty that he put his finger in her vagina on more than one occasion. Defendant's selective review of the evidence ignores that S.L. used plural verbs such as "hurts," "puts," and "would put" when describing to Jazmin and Patty defendant's intrusions into her vagina. Additionally, S.L.'s use of the words "touch" and "poke" when speaking to Ely and Davis are consistent with what she told Jazmin and Patty. Based on the totality of the evidence presented, it was reasonable for the jury to infer that defendant had used his finger to intrude, however slightly, into S.L.'s vagina on more than one occasion.

¶ 37                    3. *Counts III and IV—Sexual Penetration With an Object*

¶ 38        Defendant next argues that the State failed to prove that he caused any penetration of S.L.'s vagina with an object because she never specified whether he used the pen to touch her on her clothing or on her skin. Defendant argues that it "would be improper speculation and proof less than beyond a reasonable doubt" for the jury to conclude based on this evidence that actual contact with S.L.'s vagina occurred.

¶ 39        "Sexual penetration"—here, in the context of a pen to a vagina—means *any contact*, however slight, between the sex organ of one person and an object. 720 ILCS 5/11-0.1 (West 2014). The legal distinction between penetration with a finger and with an object is that the

State must prove an *intrusion* into the sex organ with a finger but only *contact* with the sex organ with an object.

¶ 40 Ely asked S.L. if defendant touched her with anything other than his finger. She responded that he also "tries to do it with a pen." She said that he pokes it in where she goes potty, which she confirmed was her vagina. Still describing the touching with the pen, S.L. said that defendant "pokes it like really hard *** and I don't like it." She said that he poked her with the pen twice. S.L. described it as a black pen that also bubbles on the top. At the trial, S.L. identified a blue "bubble pen" in a photograph that showed the contents of a kitchen drawer in S.L.'s home.

¶ 41 Davis testified that S.L. told him that defendant did bad things and that he poked her a lot where she goes potty. Davis asked whether she meant from where she pees or where she poops, and she said that it was from where she pees. Davis asked what defendant poked her with, and she responded "that he used his finger and then a pen, and that he did it at night when mom wasn't there."

¶ 42 Defendant disregards the testimony of Ely and Davis, focusing on S.L.'s testimony to make his argument. She was asked during direct examination if defendant touched her with a pen, and she responded: "No, I don't think so." Defendant characterizes this statement as a denial creating a reasonable doubt of his guilt. Defendant overlooks the purpose of section 115-10, which specifically allows out-of-court statements to be admitted because very young child witnesses often lack the cognitive skills to effectively communicate instances of abuse at trial or they might be psychologically impeded from doing so. *Bowen*, 183 Ill. 2d at 115. The jury heard from Ely and Davis, who testified that S.L. told them that defendant touched her vagina with a pen. The jury may have reasonably concluded that during her testimony in a formal courtroom setting, in front of defendant and many strangers, S.L. had difficulty communicating the instances of abuse. S.L.'s inability to testify to or remember what happened with the pen does not negate the testimony of Ely and Davis.

¶ 43 Defendant also asserts that the evidence was insufficient because neither Ely nor Davis asked S.L. to clarify whether defendant touched her with a pen over or under her clothing. This argument ignores that S.L. told Ely that defendant poked the pen "in" where she goes potty. It also overlooks that S.L. told Ely that defendant "sometimes" touches her on the skin where she goes potty. A reasonable juror could conclude from the testimony of Ely and Davis that defendant made actual contact with S.L.'s vagina using a pen and that he did so more than one time.

¶ 44 Accordingly, we determine that the evidence was sufficient for the jury to convict defendant of two counts of sexual penetration with a finger and two counts of sexual penetration with an object.

¶ 45                               B. Illinois Supreme Court Rule 431(b)/*Zehr* Principles

¶ 46 For reasons that will become apparent, we pass over defendant's one-act, one-crime argument and turn now to defendant's third issue. Defendant argues that he was denied a fair trial because the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by failing to ask any potential jurors during *voir dire* whether they understood and accepted the third of the four *Zehr* principles, that defendant was not required to offer evidence on his own behalf. See *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984). Defendant additionally argues that

he was denied a fair trial because juror number 37 was not asked if she understood and accepted *any* of the *Zehr* principles.

¶ 47    The State answers that, even if the court did err in failing to ask whether potential jurors understood that defendant was not required to present evidence, defendant cannot demonstrate prejudice because he offered several witnesses and testified on his own behalf. The State further contends that defendant cannot demonstrate that the court's failure to ask juror number 37 about any of the *Zehr* principles was plain error because the evidence at the trial was not closely balanced.

¶ 48    Defendant acknowledges that these Rule 431(b) issues were not preserved, but he argues that we should review them under the plain-error doctrine. The plain-error doctrine permits appellate review of a clear or obvious unpreserved error when (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) when the error was so serious as to threaten the integrity of the judicial process, regardless of the closeness of the evidence. (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. Absent evidence that the error produced a biased jury, which is not alleged here, a Rule 431(b) violation is not cognizable under the second prong of the plain-error doctrine. *Sebby*, 2017 IL 119445, ¶ 52. Therefore, to prevail on his claim of a Rule 431(b) violation, defendant must demonstrate first-prong plain error. We conduct a *de novo* review of alleged violations of Rule 431(b). *People v. Wilmington*, 2013 IL 112938, ¶ 26.

¶ 49    The initial step in any plain-error analysis is to determine whether there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49. We first address defendant's contention that the trial court erred by failing to *voir dire* juror number 37 on whether she understood and accepted any of the *Zehr* principles.

¶ 50    The *Zehr* principles were codified by our supreme court in Rule 431(b), which provides:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her ***.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 51    The clerk called juror number 37 and juror number 54[2] at the same time to replace two jurors who had been excused from panel number three. The record is clear that the court did not recite the *Zehr* principles to them, nor did it ask whether they understood and accepted the *Zehr* principles. This was clear error. See *People v. Thompson*, 238 Ill. 2d 598, 607 (2010) (failure to question each potential juror whether he or she understands and accepts each of the principles is a violation of Rule 431(b)).

---

[2]Juror number 54 was not seated and defendant does not argue error for failing to *voir dire* this potential juror regarding the *Zehr* principles.

¶ 52    Once clear error is established, the remaining question in a first-prong plain-error case is whether the evidence is closely balanced. *Sebby*, 2017 IL 119445, ¶ 69. "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). An inquiry regarding closeness of the evidence requires the reviewing court to conduct a qualitative, commonsense assessment of the totality of the evidence within the context of the case. *Sebby*, 2017 IL 119445, ¶ 53. To accomplish this, we look at the evidence on the elements of the charged offenses along with any evidence regarding the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 53    Here, defendant was convicted of four counts of predatory criminal sexual assault under section 11-1.40(a)(1) of the Criminal Code of 2012, which provides:

> "(a) A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits *** an act of sexual penetration, and:
>
>     (1) The victim is under 13 years of age." 720 ILCS 5/11-1.40(a)(1) (West 2014).

The ages of defendant and S.L. were not in dispute. Thus, the key element that the State had to prove for each count was that defendant knowingly committed an act of sexual penetration. As to counts I and II, sexual penetration meant an intrusion, however slight, of defendant's finger into S.L.'s vagina on two separate occasions. Regarding counts III and IV, sexual penetration meant any contact, however slight, between an object and S.L.'s vagina on two separate occasions.

¶ 54    Defendant was also convicted of two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)), which required the State to prove for both counts that defendant knowingly committed an act of sexual conduct with S.L.

¶ 55    The State proved its case largely through the testimony of several section 115-10 witnesses. Jazmin testified that S.L. told her that defendant "hurts" her, that he "did things to her," and that he "puts [his] fingers in her vagina." Patty testified that S.L. told her that defendant would "put his fingers in her private part" and that he would "try to put his thing inside her." S.L. told Ely that defendant "does bad stuff to me," "hurts me," and would use his finger to hurt her where she goes potty, like he was poking something. S.L. said that his finger sometimes went inside her clothes and touched her skin and that this happened more than one time. Davis testified that S.L. told him that defendant poked her a lot from where she pees, with his finger and a pen.

¶ 56    S.L. testified that she could not remember much about defendant living with her, saying: "I forgot a lot of it. I just forgot." She testified that she had problems with defendant but that she could not remember what they were. The State extensively questioned S.L. on what happened to her and she was unable or unwilling to recall pertinent details other than that something happened in her room at night and that she thought it happened more than one time. S.L. twice said that there was no one else in the room when it happened. She testified that she told her father about what happened but could not remember telling others, though the record is clear that she told at least five other people. She said that she thought she was wearing pajamas and underwear when it happened and that she could not remember if it happened over or under her underwear. When asked if she remembered talking with Ely about living with defendant—as shown in the video of the interview, which she had watched in the week before the trial—she said: "I don't remember. I don't think so. Maybe." S.L. testified that she did not know why she came to court. S.L. said that she forgot everything after DCFS placed her with

- 10 -

Patty: "I forgot what happened because, um, I just didn't want to remember about it, because at the time that I had to go to my cousin's house, she took me just somewhere else to forget about it; so I forgot all about it and then I forgot everything." S.L. identified a "bubble pen" in a photo of the contents of a kitchen drawer in the home she shared with Sasha and defendant. When asked if defendant touched her with the pen she answered: "No, I don't think so."

¶ 57    Defendant testified that he was working hard, Monday through Friday, that summer to save money for college. He said that he went to the home of Sasha and S.L. only to take naps. He described starting his typical day around 3:30 a.m. to get to work by 4 a.m. He was scheduled to work until 2:30 p.m. but was often required to work overtime until 4:30 p.m. After work, he would take a 30-minute nap and go to the gym, where he would spend an hour or two working out. He said that two to three times per week he would go from work directly to his Uncle Eldon's home, where he would help him with his plumbing business. He testified that for two weeks in July, he went five times per week to his Uncle Jason's house to practice a dance that he performed at his niece's debutante ball. He testified that he stayed at Jason's house until late at night or spent the night and went directly to work from there the next day. Otherwise, defendant testified, he would arrive home around 1 a.m. and "take a rest" before returning to work at around 4 a.m. Defendant said that his religious beliefs precluded him from working on weekends. He testified that he spent weekends with his cousins, Ashley and Shaunilia, at his Aunt Olive's home.

¶ 58    Defendant further testified that he and S.L. had a good relationship. He said that he would spend time with her and teach her about mathematics and the Bible. He testified that he did not put or try to put his finger, his penis, a pen, or any other object in S.L.'s vagina or anus: "No. Under no circumstances would I do that," and, "[T]hat's just not my nature. My family raise [*sic*] me to be a better person." Defendant also denied that he ever choked, hit, screamed at, threatened, or scratched S.L.

¶ 59    Defendant argues that the evidence of his guilt was closely balanced because, at the trial, S.L. did not accuse him of abuse or substantially corroborate any of the accusations made through the section 115-10 witnesses. He argues that the only evidence of guilt came from the section 115-10 witnesses, with no eyewitnesses or physical evidence. Defendant argues that in contrast he testified to a plausible version of events and denied that any of these alleged attacks ever occurred. The State responds that defendant has not established that the evidence was closely balanced, arguing that S.L.'s out-of-court statements were credible and corroborated, whereas defendant's accounts were inconsistent.

¶ 60    A commonsense assessment of the evidence reveals that it was closely balanced. At the trial, S.L. was unable or unwilling to tell the same story that she earlier told the section 115-10 witnesses. The testimony of the section 115-10 witnesses was largely consistent, but so was the testimony of defendant and his witnesses. Minor discrepancies muddied the water on both sides, but neither account was fanciful or implausible. The outcome turned on how the jury resolved the conflicts in the testimony where there was no extrinsic evidence presented to corroborate or contradict either version of events. Indeed, this was a contest of credibility between the accounts of the section 115-10 witnesses and that of the defendant, and credibility was the only basis on which this case could be decided. In such a contest of credibility, the evidence was closely balanced. See *People v. Naylor*, 229 Ill. 2d 584, 606-08 (2008).

¶ 61    Rule 431(b) was adopted by our supreme court to ensure that "the defendant has a fair and impartial jury—a jury that understands and accepts four important constitutional principles."

*Sebby*, 2017 IL 119445, ¶ 67. A Rule 431(b) error might not bear upon the evidence but can still affect the verdict because it relates to the manner in which the jury was instructed to evaluate the evidence. *Sebby*, 2017 IL 119445, ¶ 66. If jurors do not understand and accept that a defendant is presumed innocent, or that the State bears the burden of proving guilt beyond a reasonable doubt, then "credibility contests could lean in the State's favor, which also could tip the scales of justice against the defendant in a close case." *Sebby*, 2017 IL 119445, ¶ 67.

¶ 62       Here, where there is no dispute that a seated juror (number 37) was not asked if she understood and accepted *any* of the *Zehr* principles, and where the evidence was closely balanced, we have no choice but to reverse the judgment and remand the cause for a new trial. Trial courts must take notice of this important rule and employ all necessary steps to ensure full compliance in every criminal case tried before a jury. *Thompson*, 238 Ill. 2d at 616. "Had the trial court used the best practice of simply parroting the language of the rule in its questions, this issue never would have arisen on review." *Dismuke*, 2017 IL App (2d) 141203, ¶ 80 (Burke, J., specially concurring).

¶ 63       Although the evidence was closely balanced in this case, it was sufficient to convict defendant beyond a reasonable doubt. Thus, there is no double jeopardy impediment to a new trial. As to defendant's guilt, however, we reach no conclusion that would be binding in a new trial. See *Piatkowski*, 225 Ill. 2d at 566-67. Because of our disposition on this particular *Zehr* issue involving juror number 37, we need not address the parties' additional arguments regarding the third *Zehr* principle or the purported one-act, one-crime violations.

¶ 64                                    III. CONCLUSION
¶ 65       For the foregoing reasons, we reverse the judgment of the circuit court of Kane County and remand the cause for a new trial.

¶ 66       Reversed and remanded.