THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KELVIN
C. GARRETT, Defendant-Appellant.

Fifth District   No. 5—94—0549

Opinion filed June 21, 1996.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Michael Wepsiec, State's Attorney, of Murphysboro (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE HOPKINS delivered the opinion of the court:

Defendant, Kelvin C. Garrett, appeals his convictions, following a jury trial, for one count of home invasion and three counts of criminal sexual assault. On appeal, he raises four issues: (1) that he was not proven guilty of the offense of home invasion beyond a reasonable doubt, as there was no proof of bodily harm and the proof of psychological harm was inadequate; (2) that his two convictions for criminal sexual assault based upon penetration of A.W.'s vagina by his penis and by his mouth, respectively, must be vacated as these convictions arose from the same physical act underlying the injury element of the home invasion conviction; (3) that his conviction for criminal sexual assault based upon anal penetration must be reversed as the State failed to prove that an act of penetration occurred; and (4) that he was denied a fair trial when the trial court admitted evidence of another crime, which had no probative value and which was highly prejudicial. We affirm in part and reverse in part for the reasons set forth below.

I. FACTS

A.W. testified that on Sunday, March 14, 1993, she was a student at Southern Illinois University in Carbondale (SIU-C), and she lived in a trailer in the University Heights Trailer Park. At about 12:15 a.m. that morning, she arrived home and locked the front door of the trailer behind her. Although she had a roommate, she was alone as it was spring break and her roommate was in New York. She turned a light on in the living room, which she was going to leave on all night. She went to bed about 12:30 a.m. and fell asleep quickly since she was tired.

The next thing she was aware of was someone trying to wake her up. When she awoke, the light was out and someone was standing before her wearing a white mask, which had two holes for eyes and one hole for a mouth. From the area of these holes, the skin she saw appeared not to be white skin as it was very, very dark. She screamed and the man placed his hand over her mouth and told her not to move or say anything or he would kill her.

The man had A.W. place her pillow over her eyes. He pulled the blanket down and removed her pants. He did not remove her top. Just then, the telephone rang and the man became nervous and asked who would be calling her. A.W. testified that the voice was definitely a black dialect.

The man performed oral sex on A.W., and when he finished, he told her again not to move and to keep the pillow over her head. She stated that the man took his mask off to perform oral sex, as she could feel his skin and hair. His hair was very short and coarse and felt like a black person's hair. A.W. believed that the man then left the room, for she heard a light switch, and when the man returned to her bedroom, he had her lotion with him, which she recognized from the smell. Upon returning, the man turned her over onto her stomach and rubbed lotion on her buttocks and anus. She cried and asked him "not to do it." The man then penetrated her vagina with his penis. A.W. described the penetration as very painful, and she said that it was very forceful and aggressive, almost violent. The man ejaculated inside her, got up, and once again told her not to move. The man went to the bathroom, A.W. heard the water run, and then he returned with a wet cloth and cleaned her off. During this time, the man told her that he knew who she was, knew her name, knew the neighborhood, and knew where she lived, and that she should not try to call the police or he would come back and kill her. He also told her that he had a ride coming to pick him up, but it would not be there for about 15 minutes and not to move.

After about 10 minutes, A.W. removed the pillow from her head and looked to see if the man was still present. She got out of bed, put her pants on, turned on a light and walked around the trailer, and then went to the bathroom. When she came out, she noticed that the chain lock on the back door was swinging, which was unusual as the door was always locked.

A.W. called her ex-boyfriend, who she knew had been trying to call her, and had him come and get her and take her to the hospital. At the hospital, evidence of her assault was collected.

Although A.W. did not see a weapon, she assumed the man had one since he threatened to kill her. She also testified that the man

never asked for money or jewelry or any other property. He did not fondle her or kiss her prior to the assault. She did not give the man authority to enter her trailer that night. She stated that she was unable to identify the man who assaulted her.

Since the assault, A.W. has had nightmares about rape. She will not go out at night alone. She missed work for about three weeks. She now sees a counselor and is on the medication Trazodone, which her psychiatrist prescribed for her to help her sleep.

Kathy Cheek-Schumacher testified that she is a registered nurse, and that on March 14, 1993, she was on duty when A.W. came to the emergency room. A.W. was tearful, tremulous, and very upset. A.W. said she had been sexually assaulted, so Cheek-Schumacher, along with Dr. Rush, completed a sexual assault kit by taking vaginal and oral swabs. Because A.W. indicated there was no anal intercourse, rectal swabs were not taken. Cheek-Schumacher turned this kit over to Detective Dave Youngberg of the Carbondale police department

Doug Brinkley, a police officer for the City of Carbondale, testified that at approximately 1:37 a.m. on March 14, 1993, he performed a traffic stop on defendant. Defendant was driving a brown Oldsmobile. Brinkley could not recall why he stopped defendant, but he remembered that a citation was issued to defendant for no insurance. The traffic stop occurred about a mile and a half from A.W.'s residence.

The trial court instructed the jury that it was about to hear testimony about another offense and that the evidence was to be received on the issue of defendant's "identification, intent, motive, design and knowledge" and could only be considered by it for this purpose. The jury was also instructed that it was up to the jury to determine whether defendant was involved in the offense and, if so, what weight it should be given.

T.B. testified that at about 2:30 a.m., on Sunday, August 16, 1992, she and one of her roommates returned to their apartment after an evening of socializing. SIU-C was not in session at the time, as it was after summer school and prior to the beginning of the fall semester. Her roommate left the apartment to go find her driver's license, which she had lost on their walk home. T.B. fell asleep on the couch with the light on. The next thing she knew, she awoke and the light was off, and there was a black man on top of her with his hand over her mouth. He said that if she said anything, he would kill her.

The man took her shorts off but left her top on. He performed oral sex on her for about 5 or 10 minutes, then got on top of her and placed his penis inside of her. Although it was her period, the man did not remove her tampon. He ejaculated and then got off her. He

kissed her forehead and told her to turn over, which she did. The man went to the doorway, stood there a minute, and then left. T.B. thought the man had a red bandanna on his head. When her roommate returned a couple of minutes later, the police were called.

T.B. never saw a weapon, but she testified that the man had his hand in a fist behind her back, so she did not know if he was holding a weapon or not. The man never asked for money or jewelry. He did not fondle or kiss her prior to the sex act. Because the light was out, T.B. could not identify the man who assaulted her.

Icky McLaughlin, a registered nurse from Carbondale Memorial Hospital, testified that she was on duty on August 16, 1992, when T.B. came into the emergency room. She gathered the evidence of T.B.'s assault by taking vaginal and oral swabs and placing T.B.'s tampon in an envelope. She gave the sexual assault kit to a Carbondale police officer.

Brent Nausley, a police officer for the City of Carbondale, testified that he was on duty about 1:47 a.m. on November 24, 1993, when he received a call to go to Cedar Lane Trailer Park in Carbondale. A gentleman had called the police and reported that a black male, dressed in dark clothing and with a scarf covering half of his face, was standing and looking inside the window of a trailer. When Nausley arrived, there was no one in the location he was given, so he and Sergeant Don Stearns, who was with Nausley, got out of the police car and did a foot search of the area. Sergeant Stearns "engaged" in a foot pursuit of a black man, and Nausley joined the chase, but they lost the man in a rather heavily wooded area. Another officer who had joined in the search found a car abandoned in the trailer park. They determined the car was abandoned as the keys were still in the ignition, the window was down, and the engine was still warm. Upon checking, no one in the area knew about the car. The car was a tan over brown Oldsmobile, and after the registration was called in, it was determined that the car belonged to defendant. The car was still in the trailer park the next morning at 8 a.m.

Detective Dave Youngberg of the Jackson County sheriff's department testified that he investigated A.W.'s rape on March 14, 1993. He interviewed A.W. and had the crime scene processed. Crime-scene technician Gary Otey was unable to determine the perpetrator's point of entry into the trailer. Otey collected bedding, some tissues, and a lotion jar that was underneath A.W.'s bed.

Youngberg testified that Chief of Police Don Strom had asked that an unofficial task force be set up to look into the rapes occurring in the immediate area, including A.W.'s, and Youngberg was a member of this team. Youngberg knew, in A.W.'s case, that the

perpetrator was a black man, as the crime lab had found a "Negroid hair" on the lotion jar under her bed. Youngberg also worked with Lieutenant Jerry Reno, who had compiled a synopses of the rapes reported to the Carbondale police over the past one or two years. Youngberg went through these to see if there were any similarities in the crimes, and he determined that T.B.'s case was strikingly similar to A.W.'s case. The similarities he found were that both had oral sex performed on them, the offenses occurred around the same time on a Sunday morning, both cases involved a home invasion, and in each case, the man had attempted to conceal his identity, with a mask in one case and a bandanna in the other. In Youngberg's nine years of experience, during which he has been involved in the investigation of approximately 30 to 50 rapes, he never had a case where a suspect first performed oral sex before vaginally penetrating the victim. Youngberg explained that the most common form of penetration is vaginal, followed by the suspect having the victim perform oral sex on the suspect, and lastly, anal intercourse.

Because of the similarities between A.W.'s and T.B.'s cases, Youngberg asked the crime lab to send the two assault kits to the Springfield lab for a DNA profile. He made the request before he had a suspect in either case. He believed that the two crimes were committed by the same person.

On November 24, 1993, Youngberg was directed by a co-worker to go to Cedar Lane Trailer Court and look at a car there. Upon determining that the car was defendant's, Youngberg asked the lab to compare defendant's genetic material to the DNA profiles in A.W.'s and T.B.'s cases. Eventually, on February 1, 1994, Youngberg arrested defendant.

Stacie Harms testified that she does detection and analysis of blood and other body fluids for the Southern Illinois Forensic Science Center in Carbondale. She tested both A.W.'s swabs and T.B.'s swabs from their assault kits. She found that, in both cases, the swabs were positive for the presence of sperm. She also explained that the lab where she is employed does not do DNA testing but that that is done in Springfield, Illinois. She further explained that, usually, the suspect and victim should be known prior to DNA testing, to have profiles to compare. However, after talking to Youngberg, she requested the lab in Springfield to run DNA profiles on the semen found in A.W.'s and T.B.'s cases and to compare them.

William Frank testified that he is DNA research coordinator for the Illinois State Police Bureau of Forensic Sciences in Springfield, Illinois. He explained that DNA type does not vary from one tissue to another in an individual, and that DNA is the genetic code within

the nucleus of each cell. Furthermore, exposure of DNA to environmental conditions, such as moisture, heat, and sunlight, or to contaminants, such as bacteria and soil, cannot alter DNA patterns.

Frank did the DNA profiles in A.W.'s and T.B's cases. He found that the sperm-fraction DNA in each case respectively did not match either A.W.'s or T.B.'s DNA profile; however, the DNA profiles of the sperm fraction in each case matched. In his opinion, the semen found in each case came from the same person. Upon running a DNA profile on defendant's blood-stain card, he determined that the sperm DNA profiles in A.W.'s and T.B.'s cases matched defendant's DNA profile, leading to the conclusion that the semen came from defendant. The frequency of a DNA match from black males was 1 in 80 billion, while a DNA match from the white male population was 1 in 51 billion; in either population, the DNA profile found in the semen was extremely rare.

At the close of this evidence, the jury found defendant guilty of home invasion and three counts of criminal sexual assault. Defendant filed a post-trial motion, which was denied. At sentencing, the trial court imposed a sentence of 11 years' incarceration for the home invasion and nine years' incarceration for each count of criminal sexual assault, all to run consecutively, for a total of 38 years. Defendant appeals.

## II. ANALYSIS

### A. Home invasion not proved beyond a reasonable doubt

Defendant first contends that he was not proved guilty of the offense of home invasion beyond a reasonable doubt. His argument is two-pronged: first, that the State presented no evidence of physical injury to A.W., an element of home invasion and, therefore, the State did not sustain its burden of proof, and second, that if psychological harm is sufficient to show an injury for home invasion, the State's proof of this element was inadequate.

Initially, we note that in considering whether defendant was proved guilty beyond a reasonable doubt, we must review the evidence in the light most favorable to the State and determine whether the evidence was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of guilt. *People v. Harre*, 155 Ill. 2d 392, 614 N.E.2d 1235 (1993). With this principle in mind, we consider defendant's argument that the State failed to prove that A.W. sustained any bodily harm to support the injury element of home invasion.

■ The statute provides that to prove the offense of home inva-

sion, the State must show (1) that a defendant, who is not a peace officer, without authority, knowingly entered another's dwelling when one or more persons were present, and (2) that the defendant intentionally caused any injury to someone in the residence. 720 ILCS 5/12—11(a)(2) (West 1992). In the case *sub judice*, defendant argues briefly that there was no evidence of physical injury and that, therefore, he was not proven guilty of home invasion beyond a reasonable doubt. We disagree.

■ At trial, A.W. testified that defendant's penetration of her was "very, very painful" and that he was very forceful and aggressive, almost violent. We find that this is sufficient evidence to meet the requirement of injury under the home invasion statute. Our decision rests on a plain reading of the statute.

In construing a statute, the language of the statute is given its plain and ordinary meaning. *People v. Scribner*, 108 Ill. App. 3d 1138, 440 N.E.2d 160 (1982). In the home invasion statute, the term "any injury" is used. There is no definition of this term in the statute, so we consulted Webster's Third New International Dictionary and found that the term "injury" is defined as "an act that damages, harms, or hurts: an unjust or undeserved infliction of suffering or harm." Webster's Third New International Dictionary 1164 (1993). The term "hurt" is defined as "to afflict with bodily pain." An example of hurt was given as "the hot sand hurts my feet." Webster's Third New International Dictionary 1104 (1993). Thus, we find that an injury is an act that hurts, *i.e.*, that causes bodily pain. Neither term requires that there be physical evidence of bodily harm, such as bruises, lacerations, etc. Thus, we find that the evidence that defendant's penetration was very painful, as was testified to by A.W., was sufficient to satisfy the element of injury for the offense of home invasion.

Our decision corresponds to the decision in *People v. Garza*, 125 Ill. App. 3d 182, 465 N.E.2d 595 (1984). In *Garza*, the court stated that the home invasion statute:

> "necessarily requires physical injury, that is, *pain* or damage to the body." (Emphasis added.) *Garza*, 125 Ill. App. 3d at 189, 465 N.E.2d at 600.

From the foregoing quote, it is evident that pain is sufficient to support a finding of injury. While the defendant in *Garza* slapped the victim, we do not find that to be so different from this case as to prevent us from holding that a painful penetration is an injury.

Having so held, we need not consider defendant's arguments that the evidence of psychological injury was inadequate or that the State

did not prove the offense as charged as psychological injury is a material variance from the offense charged.

B. Criminal sexual assault was same physical act
■ Defendant next contends that the two criminal sexual assault convictions for oral and vaginal penetration must be vacated as they arose from the same physical act underlying the injury element of the home invasion conviction. We disagree.

The charge against defendant stated that he, knowingly and without authority, entered A.W.'s dwelling and:

> "intentionally caused injury to [A.W.], in that he: forcibly placed his penis in the vagina of [A.W.], forcibly performed oral sex on [A.W.], and threatened to kill [A.W.]."

Because of the language of the charge, defendant contends that his criminal sexual assault convictions based upon his oral and vaginal penetration of A.W. constituted the injury element of the home invasion. Defendant argues that since this is the same physical act that supports his convictions for criminal sexual assault, under *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977), his convictions for the criminal sexual assaults must be vacated.

We find this case analogous to *Garza*, 125 Ill. App. 3d 182, 465 N.E.2d 595. In *Garza*, the defendant was convicted of rape and home invasion. The defendant in *Garza* was charged similarly to defendant in this case, in that he committed home invasion by entering the victim's dwelling without authority and injured her "by raping her." The court in *Garza* stated:

> "It is our view that, in charging that defendant 'intentionally injured [complainant] *** by raping her,' the State did no more than make explicit that which was implicit in the facts of this case: that the acts which constituted the crime of rape also gave rise to the physical injury which is a necessary element of the crime of home invasion. ***
>
> ***
>
> *** Clearly, the acts which constituted the element of force, for purposes of the rape, also constituted the element of physical injury to sustain the charge of home invasion." *Garza*, 125 Ill. App. 3d at 189, 465 N.E.2d at 601.

The court in *Garza* also noted that while injury is a necessary element of the offense of home invasion, injury is not a necessary element of the offense of criminal sexual assault. We find this reasoning persuasive and in accord with *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977), and the supreme court's recent decision in *People v. Rodriguez*, 169 Ill. 2d 183, 661 N.E.2d 305 (1996).

In *King*, the supreme court stated that multiple convictions could

be sustained where a defendant has committed several acts, despite the interrelationship of the acts, where the offenses are not lesser-included offenses. *King*, 66 Ill. 2d at 566, 363 N.E.2d at 844-45. The supreme court reiterated its position in *Rodriguez*, and there held that the defendant's convictions for aggravated criminal sexual assault and home invasion could stand, even though these offenses shared the common act of the defendant threatening the victim with a gun. *Rodriguez*, 169 Ill. 2d at 188, 661 N.E.2d at 307-08. Thus, here, the pain caused by the separate physical act of the criminal sexual assault, based upon vaginal penetration, could form the injury element for home invasion, which was based upon not only injury to A.W. but also the unauthorized entry into A.W.'s dwelling.

Our decision is reinforced by the case of *People v. Dixon*, 122 Ill. App. 3d 141, 460 N.E.2d 858 (1984), wherein convictions for home invasion and murder were upheld, even though the shooting of the victim would be an element of both the murder and the home invasion. Therefore, defendant's separate convictions for criminal sexual assault and home invasion are proper and will stand.

### C. Criminal sexual assault—anal penetration

■ Defendant's third argument is that his conviction for criminal sexual assault based upon anal penetration must be reversed as the State failed to prove that an act of penetration occurred. Defendant argues that the evidence only showed that defendant touched A.W.'s anus with his finger and that this evidence is insufficient to support a criminal sexual assault conviction based upon anal penetration.

In reviewing the sufficiency of the evidence, we must look at the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found defendant guilty of criminal sexual assault based upon anal penetration of A.W. beyond a reasonable doubt. *People v. Roman*, 260 Ill. App. 3d 436, 632 N.E.2d 1 (1992). We find that the evidence was insufficient to support defendant's conviction for criminal sexual assault based upon anal penetration.

Under section 12—12(f) of the Criminal Code of 1961 (720 ILCS 5/12—12(f) (West 1992)), sexual penetration is defined as:

> "*any contact, however slight*, between the *sex organ* of one person and the sex organ, mouth or anus of another person, or any *intrusion, however slight*, of *any part of the body* of one person or of any animal or object into the sex organ or anus of another person ***." (Emphasis added.) 720 ILCS 5/12—12(f) (West 1992).

For there to be a conviction for criminal sexual assault, there must be an act of sexual penetration by the use of force or threat of force.

720 ILCS 5/12—13(a)(1) (West 1992). Here, the only evidence presented by the State was that defendant placed his finger on A.W.'s anus. This evidence is inconclusive as to whether defendant actually intruded into her anus, even slightly. The touching of the anus on the outside by a finger of a person is insufficient to support a conviction for criminal sexual assault. Therefore, we reverse defendant's conviction for criminal sexual assault based upon anal penetration.

III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgments on the home invasion conviction and the two convictions for criminal sexual assault based upon oral and vaginal penetration, but we reverse the court's judgment on the conviction for criminal sexual assault based upon anal penetration.

Affirmed in part and reversed in part.

KUEHN and GOLDENHERSH, JJ., concur.