2021 IL App (2d) 200534-U
No. 2-20-0534
Order filed February 4, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Shawn P., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Ogle County. |
| | ) | |
| | ) | No. 18-JD-31 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | John B. Roe, |
| Appellee, v. Shawn P., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence was sufficient to prove respondent guilty of aggravated criminal sexual assault beyond a reasonable doubt. Therefore, we affirmed.

¶ 2    Respondent, Shawn P., was adjudicated a delinquent minor after being found guilty of aggravated criminal sexual assault (720 ILCS 5/11-1.30(b)(i) (West 2018)), aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(2)(i) (West 2018)), and battery (720 ILCS 5/12-3(a)(2) (West 2018)). The circuit court merged the convictions for aggravated criminal sexual abuse and battery into the greater offense of aggravated criminal sexual assault and sentenced respondent to 36 months' probation. Respondent appeals the adjudication of delinquency, arguing: (1) the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt because

there was no evidence that he committed an act of sexual penetration as required for that offense; and (2) the State failed to prove him guilty of the lesser-included offenses of aggravated criminal sexual abuse and battery because there was insufficient evidence to establish an element of each offense. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On June 6, 2018, the State filed a three-count petition for adjudication of delinquency against respondent stemming from an incident that occurred on April 29, 2018, between respondent and A.K., who was the daughter of his father's then-girlfriend. At the time of the alleged offense, respondent was 12 years old and A.K. was three years old. Count I charged respondent with aggravated criminal sexual assault (720 ILCS 5/11-1.30(b)(i) (West 2018)), alleging he committed an act of sexual penetration by putting his finger in A.K.'s vagina. Count II charged respondent with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(2)(i) (West 2018)), alleging he committed an act of sexual conduct by touching A.K.'s vagina with his hand. Count III charged respondent with battery (720 ILCS 5/12-3(a)(2) (West 2018)), alleging he knowingly and without legal justification made physical contact of an insulting or provoking nature with A.K. by touching her vagina with his hand.

¶ 5        On November 13, 2018, the State filed a motion pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/115-10 (West 2018)) to allow the hearsay statements A.K. made to her mother and during a recorded child-sensitive interview. The motion specified that A.K. was under the age of 13 when she told her mother about the incident and that A.K. would testify at trial. Following a hearing, the circuit court found that the time, content, and circumstances of the out-of-court statements A.K. made to her mother and during the

child-sensitive interview had sufficient safeguards of reliability and ruled that both the video-taped interview and the statements she made to her mother, including any gestures, were admissible.

¶ 6    On December 2, 2019, the matter proceeded to an adjudicatory hearing.  A.K. testified that she was five years old and knew the difference between telling the truth and a lie.  When she was three years old, she lived with her mother, Deandra, and her three siblings in Rochelle.  The house had a living room, inside of which was a television, a couch, a table, and a playhouse.  The playhouse had a door and a roof.  There was also a bathroom near the living room.

¶ 7    When A.K. was three years old, her mother was dating respondent's father, whom she called "big Shawn."  Big Shawn would sometimes stay overnight at her house with his two sons: respondent, whom A.K. called "little Shawn," and Connor, respondent's younger brother.

¶ 8    A.K. identified respondent as "the boy who touched [her] cookie."  She testified that she did not know the adult word for "cookie," but she stated that only girls have "cookies," that they use them to "go potty," and that it is a place on girls that other people should never touch.  On the day in question, she, respondent, and Connor were playing inside the playhouse.  She was wearing "footy jammies" with Dora the Explorer on them, but she could not remember if she had on underwear.  She testified that respondent touched her "cookie" with his hand underneath her pajamas.  "He touched the skin*** [and] [i]t felt weird."  She remembered respondent's hand moving, but she could not remember how it moved, and she could not remember if his hand or finger "went inside [her] 'cookie.' "  She also stated respondent's hand "got germs on [her cookie]."  A.K. testified that she went into the kitchen, where her mother was speaking with respondent's father, and she told her mother that "little Shawn touched [her] cookie."  Her mother and respondent's father broke up and she did not see respondent again.

¶ 9    Traci Mueller testified that she was a forensic interviewer at Shining Star Children's Advocacy Center (Shining Star).  She explained that her job was to conduct child-appropriate conversation with children when they are alleged to have been abused or have witnessed abuse. She testified as to her training and experience, as well as to the general structure of child-specific forensic interviews.  She explained that, during the interview, she typically has a "rapport building time," an "abuse scenario time," and a "closing" with the child.

¶ 10    Mueller testified that she conducted a video-recorded interview with A.K. on May 3, 2018, which was within one week of the incident.  She stated that "multi-disciplinary members" were in an observation room during the interview, who viewed it through a closed-circuit television.  They were composed of law enforcement officials, investigators from the Illinois Department of Children and Family Services (DCFS), and the like.

¶ 11    A recording of the interview was admitted into evidence and played in court.  We have reviewed the interview and describe it, pertinently, as follows.  Mueller introduced herself to A.K. and explained that her job was to talk to children "about lots of different things."  She asked A.K. to tell her about herself, and A.K. stated "Um, somebody pokes me."  Mueller inquired further, and A.K. stated "Um. Um.  Maybe my, um, cousin pokes me."[1]  She asked A.K. for her cousin's name, and A.K. replied, "[i]t's a long story."  A.K. stated that her cousin was "a boy."  A.K. then pointed to her crotch area and asked, "what does [*sic*] boys have?"  Mueller replied, "you tell me," and A.K responded, "wieners."  Mueller asked her if someone told her about boys having

_____

[1] As we note later in the disposition, Deandra, A.K.'s mother, testified that A.K. used the word "cousin" to refer to people she knows other than her parents.  A.K. also refers to her friends as "cousins" later in the forensic interview.

"wieners." A.K. then made a grabbing gesture with her right hand against her crotch area, on top of her clothes, and stated, "little Shawn touched my cookie." Mueller asked her who "little Shawn" was, and A.K. replied, "mine [*sic*] cousin's brother." A.K. was shown a drawing of a boy and a girl, and she pointed to the vaginal area on the drawing depicting a girl when Mueller asked her where the "cookie" was.

¶ 12    Mueller asked A.K. to tell her more about when "little Shawn" touched her "cookie," and A.K. responded, "I told on him and he cried." A.K. stated that "little Shawn" touched her "cookie" with "his hand," that he went inside her clothes, and that he touched "in skin." Mueller asked, "how did that feel?" A.K. replied, "he was rubbing it," and that it happened "in mommy's house." She stated that "little Shawn and Connor, who she referred to as her "cousin," came over. She also stated that her friends are her "cousins," and that "little Shawn" was a grownup and a boy. In further describing the incident, A.K. said, "little Shawn was wrestling with me."

¶ 13    Mueller then asked A.K. to tell her everything that she could remember from when they were wrestling to when "little Shawn" touched her "cookie." She answered that she was wearing "Dora" pajamas. Mueller began to ask a follow-up question about her pajamas, but A.K. interrupted her and said, "he was, he was, doing like this," as she made a repeated grabbing motion with her right hand on her crotch area, over her clothes. A.K. stated, "he was grabbing it," then moved her hand away from between her legs. Mueller asked, "how did that feel?" A.K. then returned her right hand back to her crotch area and continued to make a repeated grabbing motion. As she gestured over her crotch area, she shouted "he was trying to go in mine [*sic*] green side!" When Mueller asked her to repeat where "little Shawn" was "trying to go," A.K. again made the grabbing motion with her right hand over her crotch area and said, "in mine [*sic*] green slide [*sic*]."

Mueller asked A.K. to "tell [her] more about that," and A.K. said, "um, um, um, we were more wrestling."

¶ 14    Mueller later asked A.K. whether "little Shawn" touched the inside or outside of her "cookie." A.K.'s back was to the camera at this point of the recording, but she appeared to again gesture with her hand over her crotch area, and she said, "like this." Mueller stopped her and told her that she did not have to show her, but that she could just tell her. A.K. replied, "yeah, he was doing that." A.K. stated that after she told her mother what had happened, Connor, "little Shawn," and their father left her house. A.K. stated that no one else saw respondent touch her and no one else was in the room when it happened.

¶ 15    A.K. left to use the bathroom during the interview, and when she returned, she told Mueller that "little Shawn" also pinched her "butt" when her clothes were off, as well as that "little Shawn touched [her] 'boobs,' too, *** with his hands." She stated that this happened in her house when no one else was there. She denied wearing "Dora" pajamas when that happened. A.K. also pointed to the picture depicting a boy and stated that she "touched little Shawn's 'butt' and that she touched his "wiener" when his clothes were off. She said that his clothes "ran away." She also stated that she hurt "little Shawn" and that a marker touched his "wiener," but she never saw or touched his "wiener." The interview concluded after approximately 20 minutes.

¶ 16    Mueller testified that A.K. was very "forthcoming about what *** she was there for," and she "actually went right into the *** abuse allegation." There was no opportunity to build rapport. Mueller stated that, because of A.K.'s age, she had a hard time with sequencing events. She noted that A.K. was "very consistent on some things [but with] other things, she's not, which is normal for a three-year-old." Mueller testified that, when interviewing a child that age, she hopes "to get the 'who' and the 'what,' and maybe the 'where.' " She explained that that was "about all you're

going to concretely get from a three-year-old." Mueller testified that she was able to get the "who," "what," and "where" from A.K., "with some details, even." Mueller acknowledged that A.K. mentioned touching respondent's "wiener" toward the end of the interview, but she stated that A.K. was finished concentrating on the interview and had become "very inconsistent with any of the details *** at that point." She stated that she could not tell if that occurred on the same day as the alleged offense. Mueller noted that A.K. repeatedly tried to demonstrate on her own body how respondent touched her, but she stopped her from doing so. She explained that she does not want children to expose themselves or to reenact what someone did to them. She agreed that it would be easier for a three-year-old-child to "show" her what happened than to describe it.

¶ 17    Deandra G. testified that she was A.K.'s mother. She also had a 14-year-old boy and twin 16-year-old girls. She explained that A.K. used the word "cousin" to describe people she knows other than her parents. Deandra testified that, in April 2018, she lived in a house in Rochelle, Illinois, and there was a Little Tykes playhouse in the back of her living room, near the bathroom. The playhouse was an outdoor toy, but she brought it in because it was cold outside and A.K. wanted to play in it. The playhouse was about four feet long by four feet wide, and it was big enough for A.K. to go in and out of.

¶ 18    Deandra testified that in April 2018 she had been dating respondent's father, Shawn Sr., for approximately four months. On April 29, 2018, Shawn Sr. and his two sons, Connor and respondent, were staying at her house. Her son was not home that day, but her twin daughters and A.K. were home. After everyone ate breakfast together, the children dispersed from the kitchen table. She did not know where any of the children went because they "went their own separate ways." While she and Shawn, Sr. cleaned up the kitchen table, A.K. came into the kitchen and stated, "mommy, little Shawn touched my cookie." She immediately knew what A.K. meant,

because "cookie" was the term they used for the vaginal area. Deandra told Shawn, Sr. that he "need[ed] to get [his] kids and get the f*** out of [her] house." After that, "chaos ensued. Connor started crying, [respondent] started crying, everybody was crying, *** [and Shawn, Sr., Connor, and respondent] got their stuff and *** left." Deandra testified that A.K. was wearing pajamas at the time, but she could not recall if A.K. was wearing underwear because she used to remove all her clothes when she went to the bathroom and would not put her underwear back on.

¶ 19    Deandra testified that she did not immediately call the police because she was unsure how to handle the situation and she wanted to get A.K.'s father involved. She called A.K.'s father, who came over. Together, they examined A.K.'s vagina for any cuts or injuries, but they did not observe any. A.K. was not examined by a doctor after the incident. A.K.'s father later told Deandra that he thought they should call the police. They reported the incident together to the officer that was dispatched to Deandra's home that evening. Deandra testified that, throughout that day, A.K. "consistently" brought up with her what respondent had done, "about [respondent's] hand being placed inside of her pajamas and rubbing her 'cookie.' "

¶ 20    Monica Miller testified that she was a DCFS investigator. Within 24 hours of receiving the "hotline tip," she questioned A.K. and her three siblings to "have eyes on" them and verify that they were safe. She did not ask A.K. or any of her siblings about the incident, and she did not know if anyone other than A.K. observed it. On July 26, 2018, she questioned respondent outside his home regarding the incident, and respondent was cooperative. Respondent told her that he, his brother, and A.K. were playing in the playhouse upstairs, that A.K. was sitting on his lap, and that, as they got up, A.K. tripped and started to fall forward. Respondent told Miller that he grabbed A.K.'s stomach and pulled her back to prevent her from falling. Respondent denied inappropriately touching A.K., putting his hand down her pants, or touching her private area.

¶ 21 Shawn, Sr., testified that he was respondent's father, and that respondent was born on October 11, 2005.

¶ 22 Officer Ryan Kovacs of the Rochelle Police Department testified that on April 29, 2018, at approximately 5:30 p.m., he was dispatched to Deandra's home regarding an alleged criminal sexual assault. Deandra and A.K.'s father were present when he arrived, and he spoke with them on the front porch. He did not speak with A.K. or with any of the other children that were home. He did not take any photos or collect any evidence, and he did not inquire as to what A.K. was wearing at the time of the incident or what room it occurred in.

¶ 23 Detective Brian Albers of the Rochelle Police Department testified that he was assigned to follow up with the investigation. He contacted DCFS and arranged an interview for A.K. at Shining Star. On May 3, 2018, he was at Shining Star, in another room, during the interview, and he spoke with Deandra afterward. On May 9, 2018, he met with respondent and his father at their house. He read respondent his rights from a pre-printed "juvenile form" that he provided respondent, and respondent signed it.

¶ 24 Angelique G. testified that she was A.K.'s sister. She was 16 years old when she testified. She could not remember the last time that either "big Shawn" or respondent were at her house. She never played with respondent, but she had seen A.K. play with him. She could not recall if she saw A.K. and respondent play together in her living room. She did not know if she ever observed respondent touch A.K. inappropriately.

¶ 25 Arianna G. testified that she was A.K.'s 16-year-old sister. She remembered "big Shawn" and respondent, and she remembered when they used to come to her house. She recalled having breakfast on April 29, 2018, and that A.K. and respondent were in the living room afterward. She

did not observe A.K. and respondent in the playhouse that morning. She "didn't see anything happen" because she went upstairs to her room after breakfast.

¶ 26    Connor P. testified that he was respondent's eight-year-old brother. He stated that he knew the difference between the truth and a lie, and he knew the importance of telling the truth. He recalled going to A.K.'s house with his father and brother, and he was six years old the last time they were there. That day, he, respondent, and A.K. played in the playhouse in the living room "for *** like, a couple minutes." The trio fit inside the playhouse "if [they] squeeze[d]." They played either "store" or "house." Connor testified that he did not see respondent touch A.K. or put his hand down her pants. He also did not see respondent or A.K. take off their clothes.

¶ 27    Connor further testified that, at some point, he exited the playhouse to use the bathroom. He was gone for "like one minute," while respondent and A.K. remained in the playhouse. He could not remember if anyone else was in the living room, but he thought his father was in the kitchen with Deandra and A.K.'s sisters were in their room. When he returned after using the bathroom, respondent and A.K. were still playing inside the playhouse, and they both had their clothes on. The trio continued to play inside the playhouse. Connor testified that he did not notice when A.K. left the playhouse, but he, his father, and brother had to leave "after [A.K.] tells."

¶ 28    William "Rob" K. testified that he was A.K.'s father. On April 29, 2018, he received a phone call from Deandra regarding the incident, after which he went to her house. His attorney advised him to contact the police, and Deandra called them. He was present when police responded to Deandra's residence. The police did not question A.K. that evening.

¶ 29    Shawn Sr., respondent's father, testified that he was at Deandra's house on April 29, 2018. After breakfast, "as far as [he was] aware, all the kids went to the living room." It was not possible to see the entire living room from the kitchen, "but if you stepped out of the kitchen for, maybe a

foot or two, you could see *** where the *** playhouse was." He used the bathroom "off of the living room" and next to the playhouse at least once while the children were playing inside it. He observed them "playing inside the [play]house, laughing, [and] having fun." The children all had their clothes on, and he did not see anything inappropriate. After he used the bathroom, he returned to the kitchen, where Deandra was washing dishes. He thought that Deandra went to the bathroom "at least once, as well." He could not remember how long the kids were in the living room "before everything happened." When A.K. came into the kitchen, he heard her say that respondent had touched her "cookie." Respondent then came into the kitchen "for a brief second" before Deandra told them to gather their belongings and get out.

¶ 30    Respondent testified that he recalled playing "store" with A.K. and Connor in the playhouse. Respondent testified that no part of his body touched A.K.'s body on the date of the incident. Further, he stated that he did not put his hand down her pants, put his finger inside her, or rub, touch, or pinch her butt, either on top of or under her clothes. He also stated that A.K. did not sit on his lap, and that he did not remove his clothes or A.K.'s clothes.

¶ 31    On cross-examination, respondent testified that he did not remember telling Miller that the playhouse was upstairs, that A.K. sat on his lap, or that A.K. tripped and he grabbed her. When he spoke to Miller, he knew it was important to tell the truth and that he did his best to tell her what happened in the playhouse because he was "sort of in trouble." He agreed that he spoke to Miller closer in time to when he was in the playhouse with A.K. and that his memory was not as good at trial as it was when he spoke to Miller.

¶ 32    The circuit court found respondent guilty of all three counts. Specifically, it stated that respondent had an opportunity to touch A.K. when Connor left the playhouse to use the bathroom. It also inferred that there were other times that respondent and A.K. were alone in the playhouse

because all three children could fit inside it only if they "squeeze[d]." Addressing the credibility of the witnesses, the court found A.K. credible. It stated that she provided age-appropriate testimony, and it noted that her statements to her parents and Mueller were consistent with her testimony at the hearing. Pertinently, the court stressed A.K.'s consistent statements that respondent touched her "cookie" with his hand underneath her pajamas, that respondent touched the skin, that he moved his hand, and that A.K. thought it "felt weird" and told her mother. It also stressed Deandra's testimony that "cookie" was the word she and A.K. used to refer to the vaginal area, as well as A.K.'s testimony that only girls have "cookies," and they use them to "go potty." The court was also expressly persuaded by A.K.'s recorded forensic interview, noting that "there were times when [A.K.] *** wanted to show what happened to her," which it noted was "normal" based on Mueller's testimony and experience in interviewing children of that age. Moreover, the court commented that A.K. lacked motive to lie and there was no evidence that she was coached. Concerning respondent's testimony, the circuit court stated that there were "inconsistencies everywhere," and it expressly found respondent not credible. It stressed that respondent testified on direct examination that he did not touch A.K. at all, yet he repeatedly stated during cross-examination that he could not remember if his body made any contact with A.K. The court also highlighted inconsistencies between respondent's trial testimony and his prior statements to Miller.

¶ 33    After a sentencing hearing on August 18, 2020, the circuit court merged the convictions for aggravated criminal sexual abuse and battery into the greater offense of aggravated criminal sexual assault and sentenced respondent to 36 months' probation. Respondent timely appealed.

¶ 34                                    II. ANALYSIS

¶ 35    Respondent's arguments on appeal pertain to the sufficiency of the evidence. Specifically, he argues that the State failed to prove him guilty of aggravated criminal sexual assault beyond a

reasonable doubt because there was no evidence that he put his hand or fingers inside A.K.'s vagina, such that the State did not demonstrate that he committed an act of sexual penetration as required for that offense. In respondent's view, even if the circuit court fully accepted A.K.'s trial testimony, it "described a mere rubbing of the sex organ and not an actual intrusion." Concerning his conviction for aggravated criminal sexual abuse, respondent argues that the State presented no evidence that he touched A.K. for the purpose of sexual gratification or arousal to establish an act of "sexual conduct." Finally, pertaining to his battery conviction, respondent asserts that the evidence was insufficient to demonstrate that he made any contact with A.K.'s vagina because her trial testimony was inconsistent and not credible.

¶ 36    The State bears the burden of proving the elements of the substantive offense charged in a juvenile delinquency petition beyond a reasonable doubt, just as in criminal proceedings. *In re Christian W.*, 2017 IL App (1st) 162894, ¶ 24. "Reasonable doubt exists as a matter of law when the State fails to prove an essential element of the offense." *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 130. On review, we will not overturn a trial court's delinquency finding unless, after viewing the evidence in the light most favorable to the State, no rational finder of fact could have found the offense proved beyond a reasonable doubt. *In re Gino W.*, 354 Ill. App. 3d 775, 777 (2005). In other words, our role is to evaluate whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Maggette*, 195 Ill. 2d 339, 353 (2001). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 331, 334 (2010).

¶ 37    In count 1 of the delinquency petition, the State charged respondent with violating section 11-1.30(b)(i) of the Criminal Code, which provides that a person commits aggravated criminal sexual assault if he or she is under 17 years of age and "commits an act of sexual penetration with

a victim who is under 9 years of age." 720 ILCS 5/11-1.30(b)(i) (West 2018). "Sexual penetration" is defined as "any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration." 720 ILCS 5/11-0.1 (West 2018).

¶ 38    In *Maggette*, 195 Ill. 2d at 346-47 (2001), our supreme court observed that the definition of "sexual penetration" encompasses "two broad categories of conduct," namely the "contact" clause and the "intrusion" clause. *Id*. The "contact" clause describes "any *contact* between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person." (Emphasis in original.) *Maggette*, 195 Ill. 2d at 347. The "intrusion" clause describes "any *intrusion* of any part of the body of one person or of any animal or object into the sex organ or anus of another person." (Emphasis in original.) *Id*. The *Maggette* court determined that, as used in the "contact" clause, the word "object" is limited to inanimate objects and does not include parts of the body, such as fingers. *Id*. at 349-50. Here, because the State alleged that respondent used his finger, as opposed to an inanimate object or his sex organ, mouth, or anus, this case concerns the "intrusion" clause. As such, to convict respondent of aggravated criminal sexual assault, the State was required to prove beyond a reasonable doubt that he was under 17 years of age, that A.K. was under 9 years of age, and that respondent committed an act of sexual penetration, however slight, with A.K., in that he put his finger into A.K.'s vagina. Whether sexual penetration occurred is a question of fact. *People v. Hillier*, 392 Ill. App. 3d 66, 69 (2009).

¶ 39    The evidence presented at the adjudicatory hearing was sufficient to prove respondent guilty of aggravated criminal sexual assault beyond a reasonable doubt. The ages of respondent

and A.K. at the time of the offense, 12 years of age and 3 years of age, respectively, were conclusively established at the hearing. Notwithstanding respondent's assertion that "there was no evidence that his hand or fingers went inside A.K.'s vagina," the record nevertheless contains ample evidence, which we must view in the light most favorable to the State (see *Maggette*, 195 Ill. 2d at 353), that respondent committed an act of sexual penetration with A.K.

¶ 40    At the adjudicatory hearing, A.K. identified respondent as "the boy who touched my cookie." She stated that only girls have "cookies," that other people should never touch a girl's "cookie," and that girls use their "cookie" to "go potty." Deandra corroborated A.K.'s testimony in this regard, in that she explained that "cookie" was the term she and A.K. used to refer to the vaginal area. A.K. further testified that respondent's hand went underneath her pajamas, that he touched her "cookie" and "got germs" on [her cookie]. She specified that respondent's hand "touched the skin" and described the sensation as feeling "weird."

¶ 41    Respondent asserts that A.K.'s trial testimony was insufficient to prove an intrusion, however slight, of respondent's finger into her sex organ because, in his view, she testified that she "did not know if [respondent's] finger or his hand went inside her 'cookie.' " We have carefully reviewed the transcript of A.K.'s testimony and view respondent's assertion as imprecise. A.K. did not testify that she "did not know" if respondent's hand or finger went inside her "cookie," but rather, she testified that she did not *remember*. We note that A.K. was five years old at the time of the adjudicatory hearing, which was more than 19 months after the April 19, 2018, incident.

¶ 42    Conversely, A.K.'s recorded forensic interview was conducted just five days after the incident, such that her memory of it was undoubtedly clearer than it was at the adjudicatory hearing. As noted, the circuit court found that A.K.'s statements at the forensic interview were

sufficiently reliable to be admitted under section 115-10 of the Criminal Code and, accordingly, it could rely on them as evidence.

¶ 43 As stressed by the State, as soon as she sat down to talk with Mueller about the incident, A.K. stated, "[s]omebody pokes me." Indeed, these were the first words out of her mouth. Mueller asked A.K. to elaborate, and she replied, "[m]aybe my cousin pokes me." When prompted for her cousin's name, A.K. said that it was "a long story" and stated her "cousin" was "a boy." Respondent grasps at straws to describe A.K.'s "poking" reference as an "errant statement" that was "never connected to [respondent] or A.K.'s sex organ" because, within approximately 40 seconds of twice telling Mueller that she was "poke[d]," she made a grabbing motion with her right hand at her crotch area, over her clothes, and said, "little Shawn touched my 'cookie.' " Mueller testified at trial that A.K. was "very forthcoming about what *** she was there for" and she "went right into the *** abuse allegation," even without building rapport. A.K.'s statements demonstrate that she understood the purpose of the forensic interview, and Mueller reasonably viewed three-year-old A.K.'s statement about being "poked," as did the circuit court, as a description of the way respondent touched her vagina. See *People v. Foster*, 2020 IL App (2d) 170683, ¶ 36 (finding it reasonable to infer sexual penetration where the victim used the words "touch" and "poke" to describe how the defendant's finger touched her vagina). Although A.K. did not explicitly refer to respondent as her "cousin" during the forensic interview, she stated that Connor and her friends were her "cousins," and Deandra testified at the hearing that A.K. referred to everyone who was not one of her parents as her "cousin." Put simply, nothing suggests that A.K. was referring to anyone other than respondent when she twice reported to Mueller during the first moments of the forensic interview that she was "poked."

¶ 44    A.K. also made additional statements during the forensic interview that support the circuit court's determination that respondent committed an act of sexual penetration, however slight, with A.K. In describing the incident, she stated that respondent touched her "cookie" with his hand, that he went inside her clothes, and that he touched "in skin." She stated that respondent "was rubbing it." See *Hiller*, 392 Ill. App. 3d at 69 (noting that penetration may be inferred based on testimony that the defendant "rubbed," "felt," or "handled" the victim's vagina, and such inference is only unreasonable if the victim denies that penetration occurred).

¶ 45    Later in the interview, when Mueller was midway through asking her about her pajamas, A.K. interrupted her and said, "he was doing like this," as she used her hand to make what we describe as repeated grabbing and poking gestures against her vaginal area with her hand and fingers, over her clothes. "He was grabbing it." When Mueller asked her how respondent's touching felt, A.K. returned her right hand to her vaginal area, made further grabbing and poking gestures against it, and shouted, "he was trying to go in mine [*sic*] green side!" Mueller then asked A.K. to repeat herself. At that point, A.K. returned her right hand to her vaginal area, made further grabbing and poking gestures, and stated, "in mine [*sic*] green slide [*sic*]." She gestured contemporaneously with these statements—both times. This moment was among the most descriptive and specific of A.K.'s account of the incident, yet respondent mentions neither the grabbing and poking gestures nor A.K.'s statement that "he was trying to go in mine [*sic*] green side" in his opening brief. In response to the State's reliance on them, he asserts that "[t]here is nothing in the record that indicates that 'green side' refers to any part of A.K.'s body." Although "cookie" was the only word A.K. used to describe her vagina at trial, respondent's assertion that it is "not clear what [A.K.] is referring to" when she makes these repeated gestures and statements about respondent "trying to go in [her] green side" strains common sense, and we therefore reject

it.  See *Givens*, 237 Ill. 2d at 334 (in reviewing the sufficiency of the evidence, "a reviewing court must allow all reasonable inferences from the record in favor of the prosecution").  At age three, A.K. lacked the vocabulary to tell Mueller exactly how and where respondent touched her.  Notwithstanding Mueller's efforts to stop her from demonstrating it on her own body, our review of the video confirms that she did make such a demonstration multiple times.  As noted, Mueller testified that it would have been easier for A.K. to "show" her how respondent touched her than to explain it.

¶ 46    We also note that respondent mischaracterizes the evidence when he states in his opening brief that, "[w]hen asked by Mueller if [respondent] touched inside or outside her 'cookie,' she said she did not know."  Rather, as noted earlier, when Mueller asked A.K. this question during the forensic interview, A.K. again gestured with her hand over her vaginal area and stated, "like this."  In response, Mueller stated, "it's okay, you don't have to show me.  You can just tell me." A.K. replied, "yeah, he was doing that."  Contrary to respondent's assertion, A.K. did not state that she did not know whether respondent touched the inside or outside of her "cookie," but she instead demonstrated to Mueller how she was touched.  Although her back was to the camera at this point of the video, it reasonably can be inferred that her gestures were like those when she told Mueller that respondent "touched [her] cookie," "he was doing like this," and "he was trying to go in mine [*sic*] green side!"

¶ 47    When viewed in the light most favorable to the State, A.K.'s age-appropriate statements and gestures during the forensic interview readily describe an intrusion, however slight, of respondent's finger into her vagina.  The instant case is therefore distinguishable from the cases relied on by respondent, such as *Maggette* (reversal of conviction affirmed where victim's "brief and vague reference to her vaginal area" was insufficient to prove an intrusion) and *People v.*

*Garrett*, 281 Ill. App. 3d 535 (1996) (conviction for criminal sexual assault based upon anal penetration reversed where evidence was inconclusive as to whether there was even a slight intrusion into the victim's anus), as the evidence in those cases did not establish an actual intrusion into the sex organ or anus of the victim. In this respect, it is also distinguishable from *People v. Guerrero*, 2018 IL App (2d) 160920, ¶¶ 50, 54, where we held that the victim's testimony "establishe[d] only that defendant touched [the victim] in her vaginal area," as opposed to penetrated it, because she gave an implicitly negative response to a specific question regarding penetration. Here, A.K. offered no such negative response regarding penetration, either implicitly or otherwise.

¶ 48 Finally, we note that respondent concedes that the circuit court "correctly found *** that the aggravated criminal sexual abuse and battery charges were lesser-included offenses," such that the circuit court properly merged them into the greater offense of aggravated criminal sexual assault. He also concedes that his argument pertaining to our ability to review his convictions for the lesser-included offenses hinges on us determining that the evidence was insufficient to sustain his conviction for aggravated criminal sexual assault. Because the evidence was sufficient to sustain respondent's conviction for the greater offense of aggravated criminal sexual assault beyond a reasonable doubt, we need not evaluate respondent's additional arguments that he was not proven guilty of the lesser-included offenses of aggravated criminal sexual abuse and battery.

¶ 49                                                III. CONCLUSION

¶ 50 For the reasons stated, we affirm the judgment of the circuit court of Ogle County.

¶ 51 Affirmed.