NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 231286-U

NO. 4-23-1286

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 9, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| MITCHELL A. ROGERS, | ) | No. 22CF227 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, concluding (1) no plain error occurred because (a) there was no error in allowing other-crimes evidence to show defendant's propensity, (b) the State proved defendant guilty of the sexual penetration element of the offense beyond a reasonable doubt, and (c) no prejudice occurred due to the admission of certain hearsay statements and (2) defendant was not denied effective assistance of counsel.

¶ 2     Defendant, Mitchell A. Rogers, was convicted after a jury trial of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and sentenced to 19 years' imprisonment. On appeal, defendant contends (1) the trial court abused its discretion in allowing other-crimes evidence to show propensity pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2022)), (2) the evidence was insufficient to prove him guilty beyond a reasonable doubt because the State failed to prove he engaged in an act of sexual penetration, and (3) the State relied on inadmissible hearsay

testimony as the only evidence of sexual penetration. Defendant concedes he did not preserve these issues for appeal but asks this court to review his claims under the plain error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan 1, 1967). Defendant also raises a claim of ineffective assistance of counsel on direct appeal, arguing his trial counsel provided ineffective representation by failing to (1) object to each instance when S.S. was referred to as a victim during trial, (2) remind the court to instruct the jury directly after evidence admitted pursuant to section 115-10(a)(2) of the Code (725 ILCS 5/115-10(a)(2) (West 2022)) was presented to the jury, and (3) object to certain hearsay testimony and evidence of other crimes, which he contends was irrelevant and unduly prejudicial.

¶ 3                                                    I. BACKGROUND

¶ 4          On May 2, 2022, defendant (born October 1984) was charged by information with two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)). The information alleged that between July 1, 2020, and March 23, 2021, defendant, who was 17 years of age or older, committed an act of sexual penetration with S.S. (born March 2016), who was under 13 years of age, by placing his penis in her vagina (count I) and by making contact, however slight, between his mouth and her vagina (count II). A formal indictment on both counts was filed on August 4, 2022. The Tazewell County Office of the Public Defender was appointed to represent defendant, and he entered a plea of not guilty.

¶ 5                                          A. The State's Motions *in Limine*

¶ 6          The State filed several motions *in limine* on July 11, 2023, seeking, *inter alia*, to admit (1) certain out-of-court statements made by the victim pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2022)) and (2) evidence of defendant's commission of other sexual offenses pursuant to section 115-7.3 of the Code (*id.* § 115-7.3. A hearing was held on the

motions on September 7, 2023.

¶ 7                                    1. *Out-of-Court Statements of S.S.*

¶ 8              The State filed a motion *in limine* to admit certain out-of-court statements made by the child victim, S.S., pursuant to section 115-10 of the Code. *Id.* § 115-10. The State argued the evidence would be introduced through the testimony of (1) Dakota S. (S.S.'s father), (2) Kathleen Harvey (caseworker), (3) Detective Andrew Thompson (forensic interviewer), and (4) the video recording and transcript of the Children's Advocacy Center (CAC) forensic interview of S.S. Before commencement of the hearing, the State withdrew the requests with respect to the testimony of Dakota and Harvey, proceeding only on the testimony of Detective Thompson and the video recording and transcript.

¶ 9                                    a. Detective Thompson's Testimony

¶ 10             Detective Thompson testified he has been with the Pekin Police Department for 20 years and is trained as a forensic child interviewer. He explained in detail his training through the Child First program and the techniques and procedures for interviewing children who have made allegations of abuse. On April 1, 2021, he interviewed S.S., who had just turned five years old. He explained his initial discussion with her was to build a rapport, and while doing so, S.S. "made a spontaneous disclosure" of both physical and sexual abuse. Detective Thompson used gender- and age-appropriate anatomical diagrams of a boy and a girl during the interview. S.S. identified defendant (her mother's boyfriend) as her abuser and specifically described "penis to vagina contact and penis to mouth contact, face contact." Detective Thompson was not informed as to whether S.S. had any developmental delays or had been exposed to any other "sexual sort of material or conduct" prior to the interview. On cross-examination, Detective Thompson explained when a child has made a disclosure, the forensic interview is important because "it

shows a level of consistency from the child, where they make their initial outcry, we have them come in for the forensic interview, and then we can compare the initial outcry disclosure to the forensic interview disclosure to determine if the child's disclosures are credible or not." He explained children have difficulty "maintaining a lie over time because they can't remember all of the details. What makes a child credible by reciting the same disclosure over time is they're—they're pulling it from memory."

¶ 11                                b. The Video Recording of S.S.'s Forensic Interview

¶ 12        The video recording of S.S.'s interview was admitted. The video shows Detective Thompson sitting across from S.S. in an interview room. There is an easel with paper nearby, and S.S. stands up periodically to write and draw with a marker on that easel while speaking with Detective Thompson. S.S. states she does not go to school, but her brother does. She describes her favorite television program and explains the different places she has watched the cartoon, including at her "mommy's with Mitchie" but with "no Mitchie because I don't like him." When Detective Thompson tells S.S. that one of the things he talks about with kids is being safe, S.S. interrupts to say, "I'm not safe. All the, sometime at my, um, my mom's" because of defendant. She explains defendant told her to pull her pants down, and she told him, "No." After that, he pulled her pants down and tried to get her to get into the bed with him, but she "kept telling him no." She then says he "spanked me in the face" and "slapped me with a spoon on my foot when I was still being good" and that "I was just watching tv." When asked how many times defendant had pulled down her pants, she takes the marker from Detective Thompson and says, "I will tell you how many times he would." She marks on the board while counting "one time, two time, three time." S.S. says she would write defendant's name on the board, but then she would "wipe it back off." As she tries to erase the area where she indicated she was writing defendant's name,

Detective Thompson explains to her she has a marker so it cannot be erased, so he shows her she can "scribble it out." S.S. then spends time scribbling to cover what she wrote and says, "I don't want to see his, um, messy name." When asked what she meant by not feeling safe, she replied "I don't, um, feel safe about him because he's been being mean to me." When asked what defendant does to make her feel unsafe, she says, "I don't know." S.S. interjects that she wants to go talk to the "lady" outside, but Detective Thompson redirects her and continues the interview. S.S. says defendant slapped her in the face, and she does not like him because he is mean. When asked to explain, she says, "he whips me on the butt" and "[s]panked me in the mouth" with a spoon. When asked if it happened more than one time, she repeats, "more than one time."

¶ 13        Detective Thompson continues the interview by referring back to the time when defendant pulled S.S.'s pants down and he asks her if defendant said anything. S.S. replies as follows: "[Defendant] said, 'I'm calling you[r] mom' and my mom said, 'What Mitch?' and he[—]she said[—]he said, 'I'm trying to pull, um pull, um, pants down and get her in bed with me' and my mom said 'well I'm coming home right now to kick you out.' " When Detective Thompson asked S.S. if her mom was at home or on the phone, S.S. replies, "I called her on, on my own phone or the tablet. I don't know which one." She then says her mom "came home and, um, she was still at home. She was just in her bedroom." When asked if defendant told her what he was going to do when she was in bed, she shakes her head to indicate "no." When asked what defendant used to pull her pants down, specifically what body part he used, she points to and touches her private area. Detective Thompson replies, "okay," and S.S. then explains, "it's a boy." Detective Thompson then shows S.S. the diagrams of a boy and girl and asks her to identify body parts, and she identifies the genital area of both diagrams as "private part." Detective Thompson asks S.S. to identify the part defendant used to pull down her pants and she

circles the penis on the boy diagram.

¶ 14      When asked what happened after defendant pulled her pants down with his private part, she states her mom came home and "this what she did to him." S.S. then takes the diagram of the boy and folds it in half while saying "she closed the book" and "throwed it at him." S.S. then unfolds the diagram of the boy and says, "she told him, don't do this" as she points to the penis on the boy diagram. When asked where defendant touched her with his private, she again points to the penis on the diagram and said, "he put this" "all around me" and waved her hand in a circle. When asked to mark where defendant touched her with his private on the girl diagram, she began drawing on the legs, genital area, chest, neck, and face, and she says, "that what he did to me, All around me." Detective Thompson asks what defendant said when he touched her, and S.S. replies, "nothing." When asked what she felt, she answers, "I don't know," and when asked what she heard while it was happening, she says, "nothing." Detective Thompson asks if defendant called his private part anything else, and S.S. replies, "wiener." When asked what defendant said about the "wiener," she says, "I don't know," and she again asks to leave the room. Detective Thompson redirects S.S. to ask her another question, "[C]an you tell me exactly what [defendant], when he put his private part all over your body, what exactly what he did with it?" S.S. nods her head affirmatively, says, "he just put it all over me" while waving her hands around, and then places her hands on her lower back while saying, "[o]n my back." When asked what defendant's body was doing when he was touching her with his private part, she replies, "he was, um, humping me, too." S.S. then takes the marker from Detective Thompson and scribbles on the easel again and, pointing to her scribbles, she says, "that means he was humping me." When Detective Thompson asks if she could tell him what humping means, she leans against the couch and thrusts her hips up and down quickly and makes

quick breath sounds. S.S. then says, "I don't know what else he was doing to me." She says he was making sounds when he was humping her. When asked if anyone told her not to tell what happened to her, she pauses and seems to nod her head affirmatively and then looks away. When Detective Thompson asked her who told her not to tell, she responds, "nobody." Detective Thompson then ends the interview.

¶ 15                    c. The Trial Court's Ruling on the State's Motions

¶ 16        The State argued the evidence should be ruled admissible because the content and circumstances of the statements made by S.S. during the forensic interview provided sufficient safeguards of reliability and S.S. would be testifying at trial and subject to cross-examination. Defense counsel argued there was an inconsistency between one of the charges (alleging contact between defendant's mouth and S.S.'s vagina) and S.S.'s interview, which "should suggest to the Court that the circumstances of the interview were such that that statement should not be admitted because of that inconsistency."

¶ 17        The trial court determined the evidence was admissible, finding the time, content, and circumstances requirements of section 115-10 of the Code were met. See 725 ILCS 5/115-10(b) (West 2022). The court raised the issue of when the required instruction for this evidence should be given to the jury. Defense counsel requested the instruction be given after the witness testifies; the State thought that request was reasonable. The court stated, "So that would be my inclination. So remind me, all right? That's my plan but you know how things go. So that would—that'll be my plan then."

¶ 18            2. *Evidence of Other Sexual Offenses Committed by Defendant*

¶ 19        The State also file a motion *in limine* seeking to admit evidence of other sexual offenses committed by defendant pursuant to section 115-7.3 of the Code. See *id.* § 115-7.3. The

State indicated this evidence would be introduced in the form of (1) the testimony of A.R. (born April 2002) about sexual abuse defendant committed against her when she was approximately eight or nine years old and (2) the testimony of Alyssa M. (A.R.'s mother), who would testify that her daughter disclosed the prior incident to her.

¶ 20    The State proffered A.R. would testify that defendant and her mother were occasionally engaged in a romantic relationship. A.R. and her mother lived with defendant for a "considerable amount of time," and she referred to him as "Uncle Mitch." She would testify "detailing digital contact between the defendant's hand and her vagina" when she was eight or nine years old and that she immediately disclosed this to her mother. The State also wished to have A.R.'s mother, Alyssa, testify, "basically as corroborative evidence to this incident and just to corroborate that that was in fact disclosed to her." The State argued the circumstances and incidents of abuse were sufficiently similar to warrant admission in this case. In support, the State explained both alleged victims were prepubescent girls, one four or five years old and one eight or nine years old, and defendant was in some form of relationship with their mothers. The State argued, although the prior incident occurred 9 or 10 years before the charged offense, it was not an unreasonable lapse in time, and the trial court should find the evidence relevant and that its probative value outweighed any prejudice.

¶ 21    Defense counsel argued the alleged other-crimes evidence from 10 years ago was not close enough in proximity and not similar enough to justify its admission in this case.

¶ 22    At the hearing, the trial court ruled Alyssa's testimony would not be admissible to corroborate A.R.'s claims, but the court took under advisement the matter of A.R.'s testimony. In a written order dated September 11, 2023, the court granted the State's motion to introduce the testimony of A.R. "for propensity purposes." We note for the record the trial court misnamed

A.R. and Alyssa in its written order, but there is no mistake as to the court's ruling, and the case proceeded accordingly. The court acknowledged certain factual differences between the two alleged offenses but found "the degree of factual similarity is sufficient for the purpose of establishing probative value." The court found "[t]he alleged facts in both cases show a propensity to commit sexual abuse against prepubescent female children while defendant is in a relationship and/or living with the alleged victim's mother."

¶ 23                              B. Defendant's Motion *in Limine*

¶ 24            On September 15, 2023, defendant filed a motion *in limine* seeking to prohibit certain statements or references as overly prejudicial. Most pertinent to this appeal, defendant sought to prohibit "any reference to S.S. as identified in the indictment as 'the victim.' " The State objected to a complete prohibition of the use of the term "victim," especially during arguments. The trial court stated the word would sometimes come up during witness testimony and noted, "If that's the case, just remind the officer or doctor not to use the word victim and use the word child." The State agreed to use the word "alleged victim" during its questioning of witnesses. Defense counsel replied, "I mean, that's fair." In the written order filed on September 18, 2023, the court ruled the term "victim" may be used in closing arguments and with proper qualifiers during questioning.

¶ 25                                    C. The Trial

¶ 26            The two-day jury trial commenced on September 18, 2023.

¶ 27                                1. *The State's Case*

¶ 28                                a. Testimony of S.S.

¶ 29            S.S. testified she was seven years old and in second grade. She identified defendant in court and stated he was her mother's boyfriend at one time, and she and her mother

had lived with him. When asked if there are parts of her body people should not touch, she replied, "my private, my bottom, and my belly." She did not know what a doctor would call her bottom and explained she urinates from her private. When shown an anatomical diagram of a girl, S.S. was asked to mark certain parts, but she did not want to. Referring to the diagram, she responded "poop" when asked what she does with her bottom. When asked if defendant ever came into her room when she lived with him, she responded, "Yes." When asked if she ever saw any part of his body she did not want to see, she replied, "His private." She did not know what a doctor would call his private, but she knew it was used to "[p]ee." When asked whether she would identify and circle the body parts if she were given a picture of a boy, she declined. She said when she saw defendant's private, he was not wearing clothes. When asked if defendant touched her with his private, she said, "No," and further said no one had touched her private. When asked if she ever saw defendant's "private parts not in [her] room," she replied, "Um, no." When asked if defendant's mouth ever touched her body or if any part of defendant's body touched a part of her body that she did not want him to touch, she said, "No." Defense did not cross-examine S.S.

¶ 30                                    b. Testimony of Dakota S.

¶ 31         Dakota testified he is S.S.'s father. S.S. lives with him, his wife, and his other four children. He testified that his relationship with Sabrina B. (S.S.'s mother) ended "not good" because she was "hostile and very aggressive." He became aware Sabrina was dating defendant, who lived next door to her, several months after their breakup. Sometime thereafter, Dakota learned defendant moved in with Sabrina. During this time, Dakota had no formal visitation schedule with S.S. Visitation was "more when [Sabrina] wanted it to be." S.S. stayed overnight with Dakota anywhere from once a month to 20 times a month. S.S. eventually moved in with

him full-time in September 2020. Dakota stated he did not have any issues with defendant before S.S. made her disclosure and moved in with him. Dakota was aware of the allegations S.S. made against defendant but said he has never spoken directly with S.S. about them. She has never confided in him about the alleged incidents, and the first time he learned about them was after S.S. told a woman from the Illinois Department of Children and Family Services (DCFS) during a home visit. After that initial disclosure, he took S.S. to meet with Detective Thompson and to CAC for counseling and other meetings. He said he did not know the details about what S.S. stated to DCFS, never spoke to S.S. about the allegations, and did not think she knows that he knows about it. When asked if S.S. was ever exposed to sexual activity or sexually explicit materials in his home, Dakota said, "No." When asked about access to technology and the Internet, Dakota said, in the last year or so, there have been "children's tablets" in his home, but S.S. did not have a phone or tablet when she lived with her mother. S.S. does not have access to the Internet. Dakota stated he was "unaware" of whether defendant and Sabrina were still together.

¶ 32     On cross-examination, Dakota acknowledged he and Sabrina both sought orders of protection against one another in the past. He reiterated that before S.S. came to live with him full-time, he saw her only when Sabrina would allow, which may have been 1 day or 20 consecutive days in a month. He stated he met defendant several weeks after he began a relationship with Sabrina. He admitted to having a physical altercation with defendant, but it did not occur until after S.S.'s disclosure of abuse was made against defendant. He stated he never had any reason to refer to private parts when talking with S.S. and he had never used the word "humping" in front of his children. He testified that in August or September 2020, S.S. began living with him full-time after the DCFS investigation was opened due her abuse disclosure and

- 11 -

she has remained in his custody.

¶ 33                    c. Testimony of Sheila Swearingen

¶ 34         Sheila Swearingen testified she is currently an independent health coach, but she was previously a DCFS caseworker. She visited Dakota's home in March 2021 as a part of a new case investigation involving P.S. (S.S.'s brother, who is one year older and had been placed in foster care). This was the first sibling home visit with S.S., which was to occur monthly. During the visit, Swearingen was having a conversation with Dakota, his wife, and S.S. She observed S.S. for several minutes as follows: "laying flat on the floor with her knees up and she was, for lack of any other way to explain it, pelvic thrusting up and down and sucking on her sweatshirt." At the time, they were discussing the family situation, including Sabrina and defendant. After S.S. calmed down, she approached Swearingen and asked about her mother. Swearingen then met with S.S. alone in a separate room. Swearingen testified that S.S. disclosed "[s]exual, oral and penetration" abuse. As a mandated reporter, Swearingen called the DCFS hotline to report the abuse and left the home. On cross-examination, Swearingen acknowledged this was her first time meeting S.S. She did not discuss the details of S.S.'s disclosure with Dakota or his wife before she left the home.

¶ 35                    d. Testimony of A.R.

¶ 36         A.R. (then 21 years old) testified that when she was between seven and eight years old, her family, which included her mother and two sisters, lived with defendant in Pekin, Illinois. She knew defendant as her mother's "really close friend" and did not know of any romantic relationship between them. They lived in a two-bedroom townhome, where she, her mother, and sisters shared one bedroom, and defendant had the other bedroom. A.R. stated one evening, the air conditioner was not working, so she, her mother, and her sisters planned to sleep

in the living room. Because she would have had to sleep on the floor, defendant told A.R. she could sleep in his bed with him. His room had a window air conditioning unit. She said she was wearing her mom's T-shirt, underwear, and shorts. Defendant told her she had to use her own blanket. A.R. woke up in the middle of the night when she felt defendant's hand in her shorts. She explained his hand was between her thighs and on her vagina. She clarified there was no "skin to skin" contact because his hand was between her shorts and underwear. A.R. confronted defendant, and he immediately stopped moving his hand, but he left it there between her legs. She explained the confrontation: "I said, 'What are you doing,' and he said, 'Only adults get the third hole.' " She stated he rolled over to go back to sleep and she left the room to tell her mother what happened. The next morning, her mother took her and her sisters to live with her grandmother. A.R. stated they reported the matter to the Pekin Police Department, but no legal action was taken. A.R. saw defendant a year later at an art festival. He yelled out to her and asked where her mother was, and she ran away and has not spoken to him since.

¶ 37 On cross-examination, A.R. stated she remembered speaking to CAC about the incident but did not remember speaking to a police officer. She recalled telling someone she was wearing a long nightshirt at the time, but she did not remember if she told them she was also wearing shorts. She acknowledged that other than talking to someone from CAC, she had never discussed the incident with anyone except her mother and a counselor.

¶ 38                                     e. Testimony of Claudia Plumer

¶ 39 Claudia Plumer is a board-certified pediatric nurse practitioner and a pediatric sexual assault nurse examination practitioner. She testified she examined S.S. on April 14, 2021. She conducted a complete medical exam, which included collecting her medical history. She used a colposcope to examine S.S.'s genitalia and observed no signs of injury and no disruption

of any tissues, including her hymen. She acknowledged that lack of injury does not mean there was no abuse. Plumer stated injuries to the "vulva region" heal "[v]ery quickly." She stated the healing period depends on the type of injuries, but typically, to get an "abnormal exam," an abused victim would typically need to be seen 24 to 72 hours after the abuse. She also described "vulvar coitus" as a type of vaginal penetration where the penis does not enter the vagina but makes contact along the labia. A diagram demonstrating this type of sexual contact was admitted into evidence. Some medical symptoms resulting from vulvar coitus are difficult or painful urination and incontinence. S.S.'s medical records showed a medical history of painful urination and "some urinary tract infections" (reported by Sabrina in S.S.'s medical records). Referring to the medical history provided by S.S.'s father, Dakota reported S.S. would often have painful urination and "[she] believe[d] incontinence" when S.S. came back from Sabrina's home. The State proposed Plumer refer to her notes to confirm her recollection about the presence of incontinence, but there is no indication that she did so. However, Plumer testified further, describing incontinence or "wetting of the pants" as "going along with" painful urination.

¶ 40    On cross-examination, Plumer acknowledged there are other possible causes of urinary tract infections and incontinence. She also acknowledged her report was inconclusive as to whether S.S. was subjected to sexual abuse.

¶ 41                    f. Testimony of Detective Thompson

¶ 42    Detective Thompson stated he works for the Pekin Police Department and was the certified forensic child interviewer who interviewed S.S. As he did at the pretrial hearing, Detective Thompson described in detail the interview process and his interactions with S.S. He explained he followed the Child First protocol, in which the interviewer does not ask leading questions and allows the child to make narrative responses in their own words. The video

recording of his interview of S.S. was admitted and published to the jury. The jury was provided transcripts of the video for reference while watching it. After the video was shown to the jury, Detective Thompson was asked about child recantation. Based on his training, he opined that in 4 to 27% of cases, children may recant their disclosure of abuse, depending on different circumstances, including the age of the child and whether the mother is supportive of the disclosure. In his experience as a detective, he recalled "a few" or "maybe twice" when a child has recanted their disclosure. He stated S.S. never recanted her disclosure to him.

¶ 43　　　　During his investigation, he conducted an interview with Swearingen, Sabrina, and defendant. He interviewed defendant on June 7, 2021. During the interview, defendant did not admit to any inappropriate contact with S.S. The recording of a portion of the interview wherein defendant described his living arrangements with Sabrina and her children was admitted into evidence.

¶ 44　　　　On cross-examination, Detective Thompson stated that going into the interview with S.S., he knew what was in the initial police report, which was that a caseworker had received a disclosure of physical and sexual abuse. When asked again about his experience with children recanting their disclosures of abuse, he said that of the approximately 50 to 75 cases he had investigated, recantation could have occurred in more than 2. Detective Thompson agreed that some things S.S. said during the interview did not make sense, such as when she said her mother came in and threw a book at defendant. He stated, however, that S.S.'s statement that defendant pulled down her pants with his penis was likely just her way of describing what happened. He acknowledged he did not follow up to ascertain whether S.S. had a phone or a tablet.

¶ 45                                    2. *Dismissal of Count II*

¶ 46            At the close of its evidence, the State moved to dismiss count II. The State

acknowledged the evidence did not support the allegations in count II that defendant made

contact between his mouth and S.S.'s vagina.

¶ 47                                       3. *Defendant's Case*

¶ 48                                    a. Testimony of Starr Jenkins

¶ 49            Starr Jenkins, defendant's sister, testified that she resided with him in August and

September 2020. She was not employed at the time, but she helped babysit S.S. and her older

brother, P.S. She was not aware of any time defendant was left alone with S.S. She said S.S.

never had a phone or tablet during that time. On cross-examination, she acknowledged that she

loved her brother, and she was not always present when S.S. was in the home.

¶ 50                                    b. Testimony of Jennifer B.

¶ 51            Jennifer B. testified she is defendant's sister-in-law (and sister to S.S.'s mother).

She lived next door to him from March to September 2020. She testified she was in defendant's

home every day, sometimes all day. She testified S.S. did not have a cell phone or a tablet. She

stated defendant was never left alone with S.S. because there was always someone at the house.

She stated defendant is now married to her sister, S.S.'s mother.

¶ 52                                4. *Jury Instructions, Verdict, and Sentence*

¶ 53            Among the instructions read to the jury after closing arguments was the following

instruction, which addresses the weighing of evidence admitted pursuant to section 115-10 of the

Code:

              "You have before you evidence that [S.S.] made statements

              concerning the offenses charged in this case. It is for you to

determine whether the statements were made, and if so, what

weight should be given to the statements. In making that

determination, you should consider the age and maturity of [S.S.],

the nature of the statements, and the circumstances under which

the statements were made."

This instruction was based on Illinois Pattern Jury Instructions, Criminal, No. 11.66 (approved

July 18, 2014) (IPI Criminal No. 11.66).

¶ 54    The jury found defendant guilty, and he was subsequently sentenced to 19 years

in prison. Defendant did not file any posttrial motions.

¶ 55    This appeal followed.

¶ 56                                    II. ANALYSIS

¶ 57    Defendant appeals his conviction for predatory criminal sexual assault of a child,

arguing (1) the trial court abused its discretion in allowing other-crimes evidence to show

propensity pursuant to section 115-7.3 of the Code, (2) the evidence was insufficient because the

State failed to prove he engaged in an act of sexual penetration, and (3) the State relied on

inadmissible hearsay testimony as the only evidence of sexual penetration. Defendant

acknowledges he forfeited these issues by failing to make any objections at trial or raise the

matters in a posttrial motion, but he asks this court to review these issues for plain error. See

*People v. Herron*, 215 Ill. 2d 167, 175 (2005); Ill. S. Ct. R. 615(a) (eff. Jan 1, 1967). In addition,

defendant raises a claim of ineffective assistance of counsel, arguing his trial counsel provided

ineffective representation by failing to (1) object to each instance when S.S. was referred to as a

victim during trial; (2) remind the court to instruct the jury directly after evidence admitted

pursuant to section 115-10(a)(2) of the Code (725 ILCS 5/115-10(a)(2) (West 2022)) was

presented to the jury; and (3) object to certain hearsay testimony and evidence of other crimes, which he contends was irrelevant and unduly prejudicial.

¶ 58                    A. Evidentiary Claims Under the Plain Error Doctrine

¶ 59        Defendant acknowledges he has forfeited his claims of error regarding the evidentiary matters by failing to object at trial or raise the issues in a posttrial motion. As such, these matters will only be reviewed for plain error. The plain error doctrine is "a narrow and limited exception to the general waiver rule." (Internal quotation marks omitted.) *Herron*, 215 Ill. 2d at 177. This doctrine allows a reviewing court to consider a forfeited error affecting substantial rights in two circumstances:

> "(1) when a clear and obvious error occurred and the
> evidence is so closely balanced that the error alone threatened to
> tip the scales of justice against the defendant, regardless of the
> seriousness of the error, or (2) when a clear or obvious error
> occurred and the error is so serious that it affected the fairness of
> the defendant's trial and challenged the integrity of the judicial
> process, regardless of the closeness of the evidence." *People v.
> Moon*, 2022 IL 125959, ¶ 20.

Our first step in the plain error analysis is to determine whether any error occurred at all. *People v. Eppinger*, 2013 IL 114121, ¶ 19. "If error did occur, we then consider whether either prong of the plain-error doctrine has been satisfied." *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31 (citing *People v. Lewis*, 234 Ill. 2d 32, 43, (2009)). Making this determination requires a "substantive look" at the purported error. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003) (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)). If no error occurred, the principles of forfeiture apply.

*People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010).

¶ 60                               1. *Admission of Other-Crimes Evidence*

¶ 61        Defendant argues the trial court erred in permitting the State to present the testimony of A.R. regarding his alleged prior sexual offense against her as evidence of his propensity to commit sexual abuse. In support, defendant contends the events described by A.R. were "too far removed in time" and "bore only a tenuous similarity" to the allegations in this case.

¶ 62        Courts generally prohibit the admission of evidence of other crimes to demonstrate propensity to commit the charged crime to "protect against the jury convicting a defendant because he or she is a bad person deserving of punishment." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). However, section 115-7.3(a)(1) of the Code permits the admission of other-crimes evidence when a defendant is charged with one of the enumerated sex offenses in the statute, which includes predatory criminal sexual assault of a child. 725 ILCS 5/115-7.3(a)(1) (West 2022). Such evidence "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b). Our supreme court has held this provision allows courts to consider evidence of other crimes "for any matter, including propensity, so long as the evidence is relevant." *Donoho*, 204 Ill. 2d at 172. Furthermore, the court must ensure the "probative value [of the evidence] is not substantially outweighed by its prejudicial effect." (Internal quotation marks omitted.) *People v. Watts*, 2022 IL App (4th) 210590, ¶ 41. To guide this determination, the statute provides as follows:

                    "(c) In weighing the probative value of the evidence against

                    undue prejudice to the defendant, the court may consider:

> (1) the proximity in time to the charged or predicate
>
> offense;
>
> (2) the degree of factual similarity to the charged or
>
> predicate offense; or
>
> (3) other relevant facts and circumstances." 725
>
> ILCS 5/115-7.3(c) (West 2022).

¶ 63    Decisions regarding the admissibility of other-crimes evidence rest within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *Watts*, 2022 IL App (4th) 210590, ¶ 65. A trial court abuses its discretion if its decision is "arbitrary, fanciful or unreasonable or where no reasonable [person] would take the view adopted by the trial court. (Internal quotation marks omitted.) *Donoho*, 204 Ill. 2d at 183. Furthermore, "[e]rroneous admission of other crimes evidence calls for reversal only if the evidence was a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." (Internal quotation marks omitted.) *Watts*, 2022 IL App (4th) 210590, ¶ 65.

¶ 64    When comparing the charged offense in this case with the prior offense against A.R., the trial court found "the degree of factual similarity is sufficient for purposes of establishing probative value." We determine this was not an abuse of discretion. "The other offenses must have a threshold similarity to the charged conduct to be admissible." *People v. Smith*, 2015 IL App (4th) 130205, ¶ 23. In this case, both victims were prepubescent girls; S.S. was four or five years old at the time of the alleged abuse, while A.R. was eight or nine years old. In both instances, the victims' mothers were in some form of a relationship with defendant, and the victims and their mothers were living in the same household as defendant. Both incidents

occurred in a bedroom in the home at a time when defendant had access to the victims. Although A.R. stated she was sleeping and woke up realizing defendant was touching her inappropriately and S.S. was awake when she was abused, the manner of touching was similar. Both girls reported being touched between the legs by the defendant.

¶ 65        When considering the proximity in time of A.R.'s allegations to the charged offense in this case, the trial court considered the 9- or 10-year span of time between the incidents. The court acknowledged that probative value may decrease as "the proximity of time expands," but "[t]here is no bright line cut off to probative value." The court concluded "the amount of time between the previous offense and the current offense is not so great" as to deny admissibility of A.R.'s testimony. We agree. A greater lapse in time may lessen the probative value of the other-crimes evidence, but it is insufficient by itself to permit a reviewing court to find an abuse of discretion. *Donoho*, 204 Ill. 2d at 184 ( "[W]hile the passage of 12 to 15 years since the prior offense may lessen its probative value, standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it.").

¶ 66        We determine it was not unreasonable, fanciful or arbitrary for the trial court to determine the other-crimes evidence was relevant and its probative value substantially outweighed the prejudicial effect. There being no error in the admission of this evidence, there can be no plain error.

¶ 67                    2. *Sufficiency of the Evidence of Sexual Penetration*

¶ 68        Defendant challenges the sufficiency of the evidence, arguing the State failed to prove an element of the crime by failing to present evidence of sexual penetration.

¶ 69        "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the

prosecution, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Sauls*, 2022 IL 127732, ¶ 52. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the credibility of witnesses, the inferences to be drawn from the evidence, and the resolution of conflicts in the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jones*, 2023 IL 12810, ¶ 28.

¶ 70    Section 11-1.40(a)(1) of the Criminal Code of 2012 provides:

"(a) A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and:

(1) the victim is under 13 years of age[.]" 720 ILCS 5/11-1.40(a)(1) (West 2020).

In this case, defendant was charged with committing an act of sexual penetration by allegedly placing his penis in S.S.'s vagina. Courts have held sexual penetration may be reasonably inferred from the evidence, "even without specific testimony that the defendant was inside the victim's vagina." *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 71 (citing *People v. Hillier*, 392 Ill. App. 3d 66, 69 (2009); *People v. Foster*, 2020 IL App (2d) 170683, ¶¶ 32-36). Furthermore, "sexual penetration is not limited to an intrusion, however slight, of the vagina; the female sex organ also includes the labia majora and the labia minora." *Id.* Whether sexual penetration

- 22 -

occurred is a question of fact to be determined by the jury. *Id.*

¶ 71   After reviewing the record, we conclude the State proved defendant's guilt beyond a reasonable doubt. Although S.S., seven years old at the time of trial, denied defendant had touched her inappropriately, the jury also was able to observe her CAC interview, which took place two years earlier. At that time, S.S. described in the manner of a five-year-old girl that defendant took off his clothes, pulled down her pants, made her get into bed with him, and touched her all over her body with his penis, which she referred to as his "private." She said he used his private to touch her "all around." When asked to show on the diagram, she immediately circled the genitalia area on the girl diagram. She further explained defendant was "humping" her, and she explained this by acting out what humping meant. Swearingen testified she observed S.S. acting out in a similar way during a home visit when talking with S.S.'s father about defendant while S.S. was in the room. Detective Thompson, who conducted the forensic interview, explained (and the video confirmed) S.S. made the disclosure to him spontaneously, without any prompting questions, and she used her own words to describe defendant's conduct and even stated that it occurred more than once. Plumer testified she observed no injuries to S.S., but this was not uncommon. She also explained that vulvar coitus is a form of sexual penetration that does not involve the penis actually entering the vagina, and S.S.'s reported symptoms of painful urination, urinary tract infections, and incontinence could be consistent with a child being abused in that manner. Based on the evidence presented, it was reasonable for the jury to infer sexual penetration occurred when defendant abused S.S. as she described. Viewing the evidence in the light most favorable to the State, we conclude a rational trier of fact could have found the required elements of predatory criminal sexual assault of a child beyond a reasonable doubt. Because no error occurred, the principles of forfeiture apply.

¶ 72                    3. *Admission of Swearingen's Hearsay Testimony*

¶ 73          Defendant also argues the trial court erred in allowing the hearsay testimony of

Swearingen regarding S.S.'s initial disclosure of abuse to her without examining that evidence in

a hearing pursuant to section 115-10 of the Code. 725 ILCS 5/115-10 (West 2022).

¶ 74          Hearsay is an out-of-court statement offered to establish the truth of the matter

asserted. Section 115-10 of the Code provides an exception to the hearsay rule in cases involving

allegations of child sexual abuse. *Id.* Pertinent here is the admissibility of "testimony of an out of

court statement made by the victim describing any complaint of such act or matter or detail

pertaining to any act which is an element of an offense which is the subject of a prosecution for a

sexual or physical act against that victim." *Id.* § 115-10(a)(1). Such testimony will be admissible

only if, after a hearing, the court finds "the time, content, and circumstances of the statement

provide sufficient safeguards of reliability" and the child will testify at the proceeding or is

unavailable but there is corroborating evidence. *Id.* § 115-10(b).

¶ 75          S.S.'s disclosure of defendant's abuse to Swearingen was an out-of-court

statement made by S.S. The State argues, however, it was not offered for the truth of the matter

asserted; instead, it was offered to show the effect of the statement on Swearingen and to explain

her subsequent course of conduct, namely, her call to the child abuse hotline, which instigated

this case against defendant. Citing *People v. Boling*, 2014 IL App (4th) 120634, the State

contends it did not seek to elicit the details S.S. may have given Swearingen, but just sought to

explain Swearingen's subsequent actions.

¶ 76          The State's reliance on *Boling* is problematic for two reasons. First, *Boling*

involved the testimony of a police officer, and the court specifically found: "A police officer may

testify as to the steps taken in an investigation of a crime 'where such testimony is necessary and

important to fully explain the State's case to the trier of fact.' " *Id.* ¶ 107 (quoting *People v. Simms*, 142 Ill. 2d 154, 174 (1991)). Swearingen was not a police officer explaining the course of an official investigation, and her testimony was not essential to an understanding of the State's case. Second, this court in *Boling* determined " '[O]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information.' " *Id.* (quoting *People v. O'Toole*, 226 Ill. App. 3d 974, 988 (1992)). Swearingen's statement, however brief, gave substantive information about the conversation she had with S.S. when she said S.S. reported "sexual, oral and penetration" abuse to her. Therefore, the State should have included Swearingen's testimony in its motion *in limine* to admit statements pursuant to section 115-10 of the Code and presented her testimony at the hearing to be considered by the trial court in making its evidentiary ruling.

¶ 77          Despite this error, reversal is not required under the plain error doctrine because the evidence in this case was not closely balanced. "[I]n making a determination of whether the evidence is closely balanced, a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case." *People v. Belknap*, 2014 IL 117094, ¶ 52. Swearingen's reference to S.S.'s initial outcry of abuse was brief and lacked any context or explanation of the circumstances of S.S.'s disclosure and, contrary to defendant's contention, it was not "the only evidence of penetration." As previously discussed, the record shows the State proved sexual penetration beyond a reasonable doubt with S.S.'s own statements of his actions during her CAC interview with Detective Thompson, Plumer's explanation that vulvar coitus is considered sexual penetration, and S.S.'s medical history being consistent with that type of abuse. Our commonsense assessment of this case reveals the

evidence was not closely balanced. Therefore, no plain error occurred.

¶ 78                                    B. Ineffective Assistance of Counsel

¶ 79            Defendant raises a claim of ineffective assistance of counsel, arguing his counsel provide ineffective representation by failing to (1) object to each instance when S.S. was referred to as a victim during trial, (2) remind the court to give a jury instruction after evidence admitted pursuant to section 115-10 was presented to the jury, and (3) object to Swearingen's hearsay testimony and evidence of other crimes, which was irrelevant and unduly prejudicial.

¶ 80            All criminal defendants have the constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A claim of ineffective assistance of counsel is evaluated under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. Under the *Strickland* test, a defendant must establish (1) counsel's performance was deficient, meaning "counsel's performance 'fell below an objective standard of reasonableness,' " and (2) defendant was prejudiced, meaning "a reasonable probability exists that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 51 (quoting *People v. Valdez*, 2016 IL 119860, ¶ 14). Failure to establish either prong of the test precludes a finding of ineffective assistance of counsel. *Id.* When a claim of ineffective assistance of counsel is not raised at the trial court level, the matter is reviewed by this court *de novo*. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 85.

¶ 81                                    1. *Failing to Object to S.S. Being Referred to as Victim*

¶ 82            The trial court granted defendant's motion *in limine* seeking to limit references to S.S. as a "victim" during the trial. The State agreed to refer to S.S. as the "alleged victim" during its questioning of witnesses, and defense counsel replied, "I mean, that's fair." In the written

order granting defendant's motion, the court ruled the term victim may be used in closing arguments and with proper qualifiers during questioning. Defendant now argues his counsel was ineffective for failing to object to every instance when the State or a witness used the word "victim." In support, defendant contends the term victim was "needlessly bandied about throughout the trial" and points to several times it was used during opening statements and Detective Thompson's testimony. Referring to the use of the word during Detective Thompson's testimony, defendant contends it "created a pervasive narrative where S.S. was constantly linked to the word 'victim.' " We disagree, finding defendant's position to be misleading.

¶ 83        The State has wide latitude in making opening statements and is entitled to "comment on what the expected evidence will be and reasonable inferences therefrom in opening statements." *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993). "Absent deliberate misconduct, incidental and uncalculated remarks in opening statement[s] cannot form the basis of reversal." *Id.* Errors made in opening statements must result in "substantial prejudice such that the result would have been different absent the complained-of remark[s] before reversal is required." *Id.* at 508-09.

¶ 84        Looking at the instances complained of by defendant where the word "victim" was used during Detective Thompson's testimony, we find few times when the word "victim" was used without a qualifier. In those instances, the questioning attorney or Detective Thompson was referring generally to the process of conducting a forensic interview of child victims of crime (for example, "Is there a specific protocol that you have to use as a child forensic interviewer when specifically interviewing a child victim?"). These were not specific references to S.S. as a victim, which was the focus of defendant's motion *in limine*. Still other times, when Detective Thompson or the attorney questioning him made a general reference to child victims, a

qualifier was, in fact, used (including "potential victims," "potential or alleged victims," or "alleged victims"). The three occasions when Detective Thompson or the attorney questioning him referred specifically to the events in this case or to S.S., they referred to her as the "alleged victim." Looking at the instances defendant complains of during the State's opening statement, once again, we find use of the term in a general context, including references to Detective Thompson having a "specialization in child victim cases" and Plumer working with "abuse victims." There were two instances during opening statements in which the State referred to S.S. as a victim without any qualifier: (1) the statement that Detective Thompson's testimony would show the steps he took during the interview "were specific to child victims like this four-year-old child" and (2) when the State referred to S.S. as "his victim" (referring to defendant) at the end of its opening statement. We conclude these two references to S.S. during opening statements did not prejudice defendant in this case. Further, the several general uses of the word "victim" without a qualifier during opening statements and Detective Thompson's testimony were outside the scope of the motion *in limine*, which addressed concerns about specific references to S.S., and were also not prejudicial. Because the second prong of the *Strickland* standard is not met, there can be no ineffective assistance of counsel on this issue.

¶ 85            2. *Failure to Remind the Trial Court to Give a Jury Instruction*

¶ 86            Defendant argues his trial counsel was ineffective by failing to remind the trial court to instruct the jury about weighing evidence admitted pursuant to section 115-10(a) of the Code right after that evidence was presented to the jury. We disagree.

¶ 87            When testimony regarding a victim's out-of-court statements is admitted in a case under section 115-10 of the Code, the trial court is required to instruct the jury as follows:

"[I]t is for the jury to determine the weight and credibility to be given the statements and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115-10(c) (West 2022).

This language is reflected in IPI Criminal No. 11.66. This instruction was, in fact, given to the jury along with all the other instructions at the conclusion of the trial.

¶ 88            However, after the hearing on the State's motion *in limine*, the parties discussed when this instruction should be given and agreed that it would be appropriate to give it to the jury right after the evidence was presented. The trial court asked the parties to remind it at the time. Defense counsel failed to do so, and as a result, the instruction was not given until the end of the two-day trial. As defendant correctly notes, the purpose of jury instructions is to provide the jury with the correct legal principles to apply to the evidence to enable the jury to reach a proper conclusion based on the applicable law and the evidence presented. See *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). This jury went into deliberations instructed as to the correct legal principles applicable to the case. Defendant acknowledged the jury was given the proper instructions and has failed to show he was prejudiced in any way by the timing of the instructions. As such, there was no ineffective assistance of counsel.

¶ 89            3. *Failure to Object to Hearsay Testimony and Other-Crimes Evidence*

¶ 90            Finally, defendant argues he was denied effective assistance of counsel when his trial attorney failed to object to Swearingen's hearsay testimony about S.S.'s initial outcry of abuse and the other-crimes evidence presented to show his propensity to commit sexual abuse. We previously determined no error occurred by the admission of the propensity evidence, and

- 29 -

any error that may have occurred in allowing Swearingen to mention S.S.'s initial outcry of abuse did not constitute plain error because the evidence was not closely balanced in this case. "It will be the rare case indeed where a court finds that the evidence was not closely balanced in a plain error analysis, but then proceeds to find that the same error created the substantial prejudice required for an ineffectiveness claim." *People v. Marcos*, 2013 IL App (1st) 111040, ¶ 75. This is not such a case. Effective assistance of counsel refers to competent, not perfect, representation, and *Strickland* only requires that a defendant receive a fair trial, that is, a trial free of errors so egregious that they probably caused the conviction. *People v. Griffin*, 178 Ill. 2d 65, 90-91 (1997). In this case, defendant did not suffer substantial prejudice from his trial counsel's failure to object to the admission of either Swearingen's testimony or the other-crimes evidence because the evidence was not closely balanced. Defendant was unable to meet his burden to show that a reasonable probability exists that, but for counsel's conduct, the results of the proceedings would have been different. Therefore, his claim of ineffective assistance of trial counsel fails.

¶ 91                                    III. CONCLUSION

¶ 92          For the reasons stated, we affirm the trial court's judgment.

¶ 93          Affirmed.